Joseph W. Cotchett (SBN 36324)
Thomas E. Loeser (SBN 202724)
Gia Jung (SBN 340160)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
T: (650) 687-6000
F: (650) 697-0577
jcotchett@cpmlegal.com
tloeser@cpmlegal.com
gjung@cpmlegal.com

Edward Korsinsky*
Mark Jensen*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
T: (212) 363-7500
F: (212) 363-7171
ek@zlk.com
mjensen@zlk.com

*[Additional counsel on signature page]*

*Counsel for Plaintiffs*

*\*pro hac vice forthcoming*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

JAMES IANOZI, ROSS WHEELER, ADAM SORKIN, MINORK CALLES, JEAN HOUSEMAN, and LINAY JAMES, individually and on behalf of all others similarly situated,

           Plaintiffs,

v.

HP INC.,

           Defendant.

Case No.:

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs James Ianozi, Ross Wheeler, Adam Sorkin, Minork Calles, Jean Houseman, and Linay James ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendant HP Inc. ("Defendant" or "HP"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## **NATURE OF THE ACTION**

1. In recent years, federal courts across the country have warned that opaque digital-tracking practices pose a profound threat to Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of the most basic expectation of privacy in one's online life. When a company affirmatively represents that users may control whether their data is sold, shared, or tracked, but then secretly sells, shares, and tracks that data anyway, the misconduct is especially egregious.

2. HP operates a commercial website, https://www.hp.com/us-en/home.html (the "Website"), through which users browse products, customize computers and printers, access support services, create accounts, make purchases, and explore promotional offers. Like many modern websites, the Website displays a cookie banner and a "cookie preferences" interface (the "Cookie Settings") purporting to give users meaningful control over what data the Website shares with third parties. Though HP's banner appears differently in California and New York, in all instances, HP assures users that they may control the sale or sharing of their personal information and must opt in to any tracking.



*Figure 1 – Cookie Banner of HP, representing that users could change tracking behavior through Cookie Settings, as seen by users in California*

*Figure 2 – Cookie Banner of HP, representing that users only agree to the use of cookies and similar technologies by clicking "Accept", as seen by users in New York*

3.      Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies (the "Tracking Tools") capable of transmitting users' data the moment a user interacts with any aspect of the Website, including by clicking the "What data we collect" or "Use of Cookies" hyperlinks, or by exiting the cookie banner.

CLASS ACTION COMPLAINT

4. Users in locations such as New York were misled by the cookie banner, which claimed that their data would only be shared when they clicked "Accept." HP was aware that this banner was insufficient and misleading, as it chose to show a more substantial banner in other locations.

5. Worse still, even after users affirmatively disable the sale or sharing of their personal information and reject all non-essential cookies, the Website continues to utilize and deploy Tracking Tools which transmit users' data to the advertising, social media, and analytics companies that designed and operate the Tracking Tools (the "Tracking Entities").

6. HP's Cookie Settings deceive users by (1) placing Tracking Tools on users' browsers, which allow Tracking Entities to intercept users' communications with the Website before users have the ability to interact with the cookie banner, and by (2) continuing to use Tracking Tools that intercept and transmit user data to Tracking Entities after users toggle off the sale/sharing of personal information and reject all non-essential cookies. HP's Website design and procurement of Tracking Entities and Tracking Tools to monitor, intercept, and transmit user data constitute invasion of privacy, intrusion upon seclusion, and fraud. Misrepresenting the effectiveness of a cookie opt-out mechanism effectively deprives users of control over their personal information.

7. The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data may include webpages and products viewed or purchased; inferred interests, preferences, age, location, or other characteristics based on user behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The data also includes persistent identifiers that enable recognition of users across sessions and websites, users' email addresses, and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to as "Sensitive Information." This Sensitive Information is collected regardless of whether users click the "Accept" button.

CLASS ACTION COMPLAINT

8.     In short, the Website's Cookie Settings materially mislead users about the use and sale of their data. Defendant lulls users into a false sense of security, privacy, and control while simultaneously enabling third parties to monitor, intercept, and transmit users' online behavior in real time. Such conduct deprives users of control over their personal information and violates fundamental privacy protections.

9.     Plaintiffs' experience reflects the conduct described above. Plaintiffs—residents of Delaware, Oregon, Illinois, California, and New York—visited Defendant's Website in or around 2025 and 2026 for ordinary consumer purposes, including browsing and comparing products, reviewing pricing information, and otherwise navigating the Website's content. While accessing the Website from their respective home states, Plaintiffs encountered the cookie consent banner and related Cookie Settings. Certain Plaintiffs affirmatively declined all non-essential cookies in reliance on Defendant's representations that marketing and tracking technologies would be disabled upon rejection; others did not affirmatively accept cookies and reasonably believed that non-essential tracking would not be activated absent express consent. Despite these actions and expectations, Defendant deployed Tracking Tools that automatically intercepted, recorded, and transmitted Plaintiffs' Sensitive Information to the Tracking Entities. In each instance, Plaintiffs reasonably relied on Defendant's representations regarding cookie controls and privacy protections, yet their personal information was nonetheless collected and shared without their valid consent.

10.     Defendant invaded Plaintiffs' fundamental right to privacy and fraudulently misrepresented the Website's data-collection practices by facilitating the Tracking Entities' unlawful interception of and intrusion into Plaintiffs' Sensitive Information and private communications. In doing so, Defendant violated the federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*; California's Invasion of Privacy Act ("CIPA"), including Penal Code § 631 (illegal wiretapping) and § 638.51 (unlawful use of a pen register or trap and trace device); New York's Deceptive Acts and Practices statute, N.Y. Gen. Bus. Law § 349; New York's False Advertising Law, N.Y. Gen. Bus. Law § 350; N.Y. Civil Rights Law §§ 50 and 51, and common law,

including invasion of privacy, intrusion upon seclusion, fraud and deceit, and unjust enrichment. Plaintiffs bring this action on behalf of themselves and a class of similarly situated users harmed by Defendant's deceptive and unlawful surveillance practices.

**JURISDICTION AND VENUE**

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A). Defendant has its principal place of business located in this District.

12.     This Court has personal jurisdiction over Defendant because Defendant is registered to do business and maintains its principal place of business in this District.

13.     Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

14.     Further, as per L.R. 3-2(e), venue is proper in the San Jose Division of this District, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Santa Clara County, as Defendant's principal place of business is located in Santa Clara County.

**PARTIES**

15.     Plaintiff James Ianozi is, and at all relevant times has been, a citizen and resident of the State of Delaware. Plaintiff Ianozi accessed and used Defendant's Website for its intended consumer purposes. Most recently, in or about August 2025, Plaintiff Ianozi visited the Website while physically located in Delaware to browse and compare prices for printer cartridges and laptop computers. During that visit, Plaintiff Ianozi reviewed product listings and pricing information in order to make informed purchasing decisions. Plaintiff Ianozi accessed the

Website using the same device and web browser that he routinely uses to access social media platforms and third-party websites, including Meta-operated services (Facebook and Instagram), Google-operated services, and other digital platforms. During his use of the Website, Plaintiff Ianozi engaged with the Website's Cookie Settings and affirmatively declined all non-essential cookies, relying on the Website's representations that marketing and tracking technologies would be disabled upon rejection.

16.    Despite Plaintiff Ianozi's clear election to decline such cookies, Defendant continued to deploy third-party Tracking Tools on the Website that intercepted, recorded, and transmitted Plaintiff Ianozi's Sensitive Information, including his browsing activity, device identifiers, and related metadata, to Tracking Entities. These Tracking Tools operated notwithstanding Plaintiff's express refusal of all non-essential cookies. As a result of Defendant's implementation of third-party Tracking Tools and its misleading representations within its Cookie Settings, Plaintiff Ianozi's personal information was intercepted and recorded without his consent. Had Plaintiff Ianozi been able to rely on Defendant's representations that declining non-essential cookies would meaningfully disable tracking technologies, he would have continued to use the Website with confidence in the integrity of its privacy protections.

17.    Plaintiff Ross Wheeler is, and at all relevant times has been, a citizen and resident of the State of Oregon. Plaintiff Wheeler accessed and used Defendant's Website for its intended consumer purposes while physically located in Oregon. Most recently, Plaintiff Wheeler visited the Website in or about January 2026 for consumer browsing purposes. During that visit, Plaintiff Wheeler encountered the Website's cookie consent banner but did not affirmatively accept or decline the use of non-essential cookies, instead proceeding to browse the Website without interacting with the banner.

18.    Plaintiff Wheeler accessed the Website using the same device and web browser that he regularly uses to access social media platforms, search engines, and other third-party websites. Upon interacting with the Website, third-party Tracking Tools were deployed that intercepted and recorded Plaintiff Wheeler's browsing activity, device identifiers, and related

metadata. These Tracking Tools operated automatically upon page load, regardless of Plaintiff's lack of affirmative consent. As a result of Defendant's implementation of third-party Tracking Tools, Plaintiff Wheeler's personal information was intercepted and transmitted to Tracking Entities without his explicit authorization. Plaintiff Wheeler did not consent to such tracking and reasonably believed that, absent affirmative acceptance, non-essential tracking technologies would not be activated.

19. Plaintiff Adam Sorkin is, and at all relevant times has been, a citizen and resident of the State of Illinois. Plaintiff Sorkin accessed and used Defendant's Website while physically located in Illinois. Most recently, Plaintiff Sorkin visited the Website in or about January 2026 for consumer browsing purposes. During that visit, Plaintiff Sorkin encountered the Website's cookie consent banner but did not affirmatively accept or decline the use of non-essential cookies, instead continuing to browse the Website without interacting with the banner.

20. Plaintiff Sorkin accessed the Website using the same device and web browser that he regularly uses to access social media platforms, search engines, and other third-party websites. Upon interacting with the Website, third-party Tracking Tools were automatically deployed that intercepted and recorded Plaintiff Sorkin's browsing activity, device identifiers, and related metadata. These Tracking Tools operated upon page load despite Plaintiff Sorkin's failure to provide affirmative consent. As a result of Defendant's implementation of third-party Tracking Tools, Plaintiff Sorkin's personal information was intercepted and transmitted to Tracking Entities without his explicit authorization. Plaintiff Sorkin did not knowingly consent to such tracking and reasonably believed that, absent an affirmative acceptance of non-essential cookies, such tracking technologies would not be activated.

21. Plaintiff Minork Calles is, and at all relevant times has been, a citizen and resident of the State of California. Plaintiff Calles accessed and used Defendant's Website while physically located in California. Most recently, Plaintiff Calles visited the Website in or about January 2026 for consumer browsing purposes. During that visit, Plaintiff Calles encountered the

CLASS ACTION COMPLAINT

Website's cookie consent banner but did not affirmatively accept or decline the use of non-essential cookies, instead continuing to browse the Website without interacting with the banner.

22.    Plaintiff Calles accessed the Website using the same device and web browser that he regularly uses to access social media platforms, search engines, and other third-party websites. Upon interacting with the Website, third-party Tracking Tools were automatically deployed that intercepted, recorded, and transmitted Plaintiff Calles's browsing activity, device identifiers, and related metadata. These Tracking Tools operated upon page load despite the absence of Plaintiff Calles's affirmative consent. As a result of Defendant's implementation of third-party Tracking Tools, Plaintiff's personal information was intercepted and transmitted to Tracking Entities without his explicit authorization. Plaintiff Calles did not knowingly consent to such tracking and reasonably believed that, absent an affirmative acceptance of non-essential cookies, such tracking technologies would not be activated.

23.    Plaintiff Jean Houseman is, and at all relevant times has been, a citizen and resident of the State of New York. Plaintiff Houseman accessed and used Defendant's Website while physically located in New York. Most recently, Plaintiff Houseman visited the Website in or about February 2025 for consumer browsing purposes. During that visit, Plaintiff Houseman reviewed product information regarding copiers. During her visit, Plaintiff Houseman encountered the Website's cookie consent banner and affirmatively declined all non-essential cookies. Plaintiff Houseman consistently declines non-essential cookies on all websites she visits and relied on Defendant's Website's representations that rejecting such cookies would disable marketing and tracking technologies. After selecting the option to decline, Plaintiff Houseman reasonably believed that any non-essential Tracking Tools would be deactivated.

24.    Despite Plaintiff Houseman's express rejection of non-essential cookies, Defendant continued to deploy third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Houseman's browsing activity, device identifiers, and related metadata to Tracking Entities. These Tracking Tools operated notwithstanding Plaintiff Houseman's affirmative declination. As a result of Defendant's implementation of third-party Tracking Tools

CLASS ACTION COMPLAINT

and its representations regarding cookie controls, Plaintiff Houseman's personal information was intercepted and recorded without her consent. Had Plaintiff Houseman been able to rely on Defendant's representations that declining non-essential cookies would meaningfully prevent tracking, she would have continued to use the Website with confidence in the integrity of its privacy protections.

25. Plaintiff Linay James is, and at all relevant times has been, a citizen and resident of the State of California. Plaintiff James accessed and used Defendant's Website while physically located in California. Most recently, Plaintiff James visited the Website in or about June 2025 for consumer browsing purposes. During that visit, Plaintiff James reviewed product information regarding printers. Plaintiff James consistently declines non-essential cookies on all websites she visits as a matter of personal privacy practice. In connection with her visit to Defendant's Website, Plaintiff James engaged with the cookie consent mechanism and declined all non-essential cookies, relying on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff James reasonably believed that by rejecting non-essential cookies, her browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality.

26. Despite Plaintiff James's affirmative rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff James's browsing activity, device identifiers, and related metadata to Tracking Entities. These Tracking Tools operated notwithstanding Plaintiff's clear refusal of non-essential tracking technologies. As a result of Defendant's implementation of third-party Tracking Tools and its representations regarding cookie controls, Plaintiff James's personal information was intercepted and recorded without her consent. Had Plaintiff James been able to rely on Defendant's representations that declining non-essential cookies would meaningfully prevent tracking, she would have continued to use the Website with confidence in its privacy safeguards.

27. Defendant HP Inc. is a for-profit corporation, incorporated under the laws of the State of Delaware, with its principal place of business in Palo Alto, California. HP designs,

manufactures, and sells personal computing devices, printers, and related products and services, and offers its products for sale through its nationally accessible commercial website, https://www.hp.com/us-en/home.html. In fiscal year 2025, HP earned a net revenue of $55.3 billion, up 3.2% from the prior-year period.[1]

## **FACTUAL ALLEGATIONS**

**I.      How Websites Function**

28.      Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

29.      Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[2]

30.      Each webpage has a unique address, and two webpages cannot be stored at the same address.[3]

31.      When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[4]

---

[1]  *HP Inc. Reports Fiscal 2025 Full Year and Fourth Quarter Results*, HP, https://www.hp.com/us-en/newsroom/press-releases/2025/hp-inc-reports-fiscal-2025-full-year-and-fourth-quarter-results.html (last visited Mar. 6, 2026).

[2]  *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Feb. 17, 2026).

[3]  *Id.*

[4]  *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Feb. 17, 2026).

32.    An IP address is "a unique address that identifies a device on the internet or a local network."[5] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works. *Id.*

33.    When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfils this request, it issues an HTTP response that includes the request status and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage by the user's browser upon arrival.[6]

34.    This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

35.    The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[7] as depicted below:

*Figure 3 - Mozilla's diagram of a URL, including parameters[8]*

36.    Website owners or web developers write and manage the URLs for their websites.

---

[5] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Feb. 17, 2026).

[6] *Id.*

[7] To see examples of how Defendant used parameters to provide additional information here, *see infra,* Section C(2).

[8] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 17, 2026).

37.    URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[9] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

38.    The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[10] Today, UTF-8 is the Internet's most common character encoding.[11]

39.    URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[12] To demonstrate:



*Figure 4 – Demonstrating URL encoding and decoding[13]*

40.    Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.

---

[9] *Id.*

[10]     *HTML ASCII Reference*, w3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Feb. 17, 2026).

[11] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Feb. 17, 2026).

[12] *What Is URL Decoding and URL Encoding?*, GOCHYU (last modified Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited Feb. 17, 2026).

[13]  Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Feb. 17, 2026).



*Figure 5 – Sample webpage used to demonstrate a webpage URL*



*Figure 6 – Request URL of sample webpage from Figure 5, encoded for transmission (compare with decoded URL in Figure 5)*

*Figure 7 – Decoded, parsed data from Request URL in Figure 6, showing easy-to-read parameters and metadata*

41. After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code of the webpage, which is then processed by the user's browser, as it arrives,[14] and rendered into a visual display according to the instructions of the HTML code.[15] This is the visible, and usually interactable, website that most people think of.

42. To provide more complex website functionality, website developers will include more complex commands written in other computer programming languages, such as JavaScript snippets, within the HTML documents.[16]

43. Such complex tasks include streaming videos by Users or subscribing to Newsletters/ Digital Magazine, or code used to monitor and report user activity.

44. In short, the Internet relies on a constant back-and-forth stream of requests and responses between a user's browser and a website's stored coding and data. Importantly, the requests and responses provide a perfect snapshot of everything a user does (or does not do) on a website, and when and how they do it, and with what software and hardware.

45. Unbeknownst to users, as they browse the Website, the Tracking Tools, including third- and first-party cookies, capture and record both incoming and outgoing requests and responses that make up their entire experience on the Website.

[14] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built-in to the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 20, 2026).

[15] *What Is a URL?*, MOZILLA, (last visited Feb. 17, 2026).

[16] *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Feb. 17, 2026).

**II.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookies and Tracking Tools**

46.    Defendant voluntarily integrated Tracking Tools from various Tracking Entities into its Website's programming. Defendant's use of such tools on its Website is performed pursuant to commercial agreements between Defendant and third parties, including Tracking Entities.

47.    The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and third parties to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, or even hover over.

48.    First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

49.    Third-party cookies are placed by domains other than the Website's domain, such as google.com, facebook.com, and other advertising or analytics domains. When a user's browser loads a webpage containing embedded third-party resources, the third party's scripts determine whether its cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies contain unique identifiers that allow third parties to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

50.    As detailed further below, Tracking Tools, including cookies, that are placed on users' devices during interactions with the Website are subsequently used to intercept and record

users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

51.     Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering user preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on user profiles; and (iv) social media integration. Ultimately, Tracking Tools enable Defendant and Tracking Entities to earn more money and enhance marketing effectiveness through the collection, analysis, and dissemination of user data.

52.     Defendant owns and operates the Website, which allows users to browse HP's electronic products, seek technical support, and browse products. When users interact with the Website by navigating pages, clicking links, entering data, or ordering HP's products, they communicate directly to Defendant.

53.     Defendant chooses to place the Tracking Tools on the Website such that when users visit the Website, both first-party and third-party cookies are placed on users' devices and/or are intercepted and transmitted to Tracking Entities. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these Tracking Tools are placed and whether user data is transmitted to Tracking Entities.

54.     Defendant explains its use of Tracking Tools on the Website's Cookie Settings by stating, in substance, that they store cookies on users' browsers to "make the site work" and to "give you a more personalized web experience".

55.     The cookie preferences interface further represents that "Performance & Analytics Cookies" are used to understand user behavior across the Website to measure the performance of the Website, and that all information the cookies collect is anonymous.

> These cookies allow us to count visits and traffic sources so we can measure and improve the performance of our site. They help us to know which pages are the most and least popular and see how visitors move around the site. All information these cookies collect is aggregated and therefore anonymous. If you do not allow

these cookies, we will not know when you have visited our site, and will not be able to monitor its performance.

56. The cookie preferences interface further represents that "Personalisation Cookies" are used to provide enhanced functionality and personalization to users.

"These cookies enable the website to provide enhanced functionality and personalisation. They may be set by us or by third party providers whose services we have added to our pages. If you do not allow these cookies then some or all of these services may not function properly."

57. The cookie preferences interface further represents that "Targeting Cookies" are set by advertising partners and used to build a profile of users' interests.

"These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. If you do not allow these cookies, you will experience less targeted advertising."

58. Defendant provides additional disclosures regarding its use of Tracking Tools in their Privacy Policy. In the section addressing "Targeting Tools," Defendant informs users that certain third parties providing advertising services may collect or receive information about users' interactions with the Website through cookies and similar technologies, and that such information may be combined with data collected across different websites to deliver more relevant advertising.

"We use and allow select partners to use cookies, clickstream capture, pixels, web beacons, web collection forms and other similar technologies (collectively "Automatic Data Collection Tools") on our HP Services."[17]

**III. The Website's Cookie Banners Misled Users**

59. When users in locations such as California visited the Website, the Website immediately displayed a pop-up cookie consent banner, which informed users of the Website that "[HP] use[s] cookies" and that information about users' interactions with the Website is shared with social media, advertising, and analytics partners. Only by "clicking 'Accept' or closing" the cookie pop-up did users "agree to those purposes." The banner further presented users with the

---

[17] HP, *Privacy Policy*, https://www.hp.com/us-en/privacy/use-of-cookies.html (last visited Feb. 17, 2026).

button to accept cookies, a small 'x' in the top right to close the pop-up, a button to reject cookies, and a button labeled "More Options." This particular form of cookie consent banner is referred to herein as "Cookie Banner One."





*Figure 8 – Cookie Banner of HP representing a "cookie preferences" interface to accept or manage "Cookie Settings"*

60.    Website users who selected the "Cookie Settings" option were presented with a cookie consent preferences window, which represented that users could control how their

personal information was collected, used, sold, or shared by adjusting toggles related to targeted advertising, selling, or sharing of personal information, consistent with applicable law.

61.    Upon expanding the section addressing the sale or sharing of personal information and targeted advertising, Defendant represented to users, in substance, that they could exercise their right to opt out of the sale or sharing of personal information by using the toggle switch, and that if users opted out, Defendant would not provide personalized advertising and would not expose users' personal information to third parties. Defendant's offer was not only to discontinue disclosures through cookies, but a blanket prohibition on the selling or sharing of personal information with third parties.



*Figure 9 – Cookie Settings representing users with an option of disabling the selling of user information and targeted advertising*

*Figure 10 - Screen capture as of Dec. 4, 2025, depicting the automatically enabled tracking system*

62.     Defendant provides additional details in their cookie pop-up, noting that "Performance", "Analytics", "Personalization", and "Targeting" cookies would be deactivated by disabling targeted advertising.

63.     After users disabled the sharing of their personal information and declined all non-essential cookies other than those strictly necessary and clicked "Save Settings," users were permitted to continue browsing the Website. At that point, the cookie banner and the Cookie Settings window disappeared.

64.    Defendant's cookie banner and Cookie Settings representations led Plaintiffs, and would reasonably lead all Website users similarly situated, to believe that they had successfully disabled all non-essential cookies and the sale or sharing of their information. The banner and preference window further reasonably led Plaintiffs and all reasonable users to believe that Defendant would not allow third parties, through cookies or similar technologies, to access users' personal information on the Website.

65.    These representations were false. In reality, Defendant did not abide by users', including Plaintiffs', expressed preferences. When users chose to disable the sharing of their personal information and to decline all non-essential cookies other than those strictly necessary, they clearly communicated that they did not consent to the placement or transmission of Tracking Tools, including non-essential cookies. Nevertheless, Defendant continued to cause the Tracking Tools, including the aforementioned cookies, to be placed on users' browsers and devices so that Tracking Entities could intercept, transmit, and use users' Sensitive Information.

66.    Specifically, even after users opted out of the sale or sharing of their personal information and declined all non-essential cookies, Defendant continued to cause cookies, pixels, and similar technologies to be placed on users' devices and/or transmitted to third parties, here the Tracking Entities, resulting in the real-time collection of user data that disclosed Website users' Sensitive Information. In other words, even after users attempted to protect their privacy by not accepting the use of cookies, Defendant continued to use cookies to transmit user data to the Tracking Entities.

67.    Further, for users in different locations, Defendant's Website displayed a cookie banner that substantially differs from Cookie Banner One. For instance, when users in locations such as New York visited the Website, the Website immediately displayed a pop-up cookie consent banner, which informed users that the Website used cookies and that information about users' interactions with the Website is shared with social media, advertising, and analytics partners. The banner further presented users with the option to accept cookies, agreeing to share

CLASS ACTION COMPLAINT

information and allow the placement of cookies, or to manage their "Cookie Settings." This particular form of cookie banner is referred to herein as "Cookie Banner Two."



*Figure 11 - Cookie Banner of HP shown in New York representing a "cookie preferences" interface to accept or manage "cookie settings"*

68.    This banner is substantially different than the one shown to users in California. Users in New York are told that their cookies are only placed, and their information is only shared, if they click "Accept." They are no longer told that they accept by closing the window.[18]

69.    Additionally, the "Reject" button has been removed from the cookie banners, implying that users must "opt-in" to the use of cookies and the sharing of their information. Users are led to reasonably believe that their information will not be shared and cookies will not be placed if they exit the cookie banner without clicking "Accept."

70.    This was false. When a user takes any action on the Website, including clicking any of the hyperlinks in the cookie banner, the Tracking Tools are placed by the Website and the user's information is shared with the Tracking Entities.

---

[18] Based on a preliminary investigation of Defendant's Website and the information contained therein, users in California, Colorado, Connecticut, Virginia, Utah, Florida, Oregon, Texas, Montana, Delaware, Iowa, Nebraska, New Hampshire, New Jersey, Tennessee, Minnesota, Maryland, Indiana, Kentucky and Rhode Island receive Cookie Banner One, while users in other states received Cookie Banner Two. *See Additional Rights for Certain US States Residents*, https://www.hp.com/us-en/privacy/privacy.html?jumpid=in_R11928_/us/en/corp/privacy-central/privacy-statements (last accessed on Feb. 24, 2026).

71. Additionally, even users who chose to reject cookies were still tracked by the Tracking Tools and had their Sensitive Information shared with the Tracking Entities, just like users in California.

72. The Tracking Tools that Defendant caused to be loaded and executed by users' browsers function as an unlawful wiretap when it is executed because it enables Tracking Entities, separate and distinct parties from Defendant, to eavesdrop on, record, extract, analyze, and exploit users' Sensitive Information. The Tracking Entities are not mere passive tools or instruments of Defendant; they independently collect, analyze, and use the intercepted communications for their own commercial purposes.

**IV. Defendant's Website Uses Tracking Tools To Spy on Users.**

73. Defendant operates the Website and has installed Tracking Tools on the Website created by Tracking Entities. These Tracking Tools operate invisibly, tracking Website users' activity surreptitiously by intercepting communications as they arrive to or are sent by users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities.

74. Generally, the Tracking Tools collect information about users' site activity when events specified by Defendant, like adding a product to the shopping cart or loading specific webpages, are triggered. Defendant added parameters to events that determine just how much data is collected, and how specific that data is.

75. Parameters are strings of text that website owners add to a URL to track and organize their webpages.[19] URL parameters include key-value pairs formatted as "key=value."

    a. The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

---

[19] Yongi Barnard, *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (last updated Feb. 5, 2026), https://backlinko.com/url-parameters (last visited Feb. 17, 2026).

b.    The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)



*Figure 12 - Diagram of a URL displaying how parameters function*[20]

### A.    The TikTok Pixel

76.    TikTok offers software known as a "tracking pixel" to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

77.    The TikTok Pixel is a snippet of code that begins to collect information the moment a user lands on the Website, before any pop-up or cookie banner advises them of the invasion or seeks their consent. To use the TikTok Pixel, the website operators, including Defendant, must include the specific pixel IDs associated with their websites, which allows TikTok to link the intercepted data back to their individual TikTok business profiles.[21]

78.    Defendant's TikTok Pixel ID is included in transmissions sent to and from users' devices, as seen in *Figures 15* and *17*—the TikTok JavaScript code in *Figure 15* references

---

[20] *Id.*

[21]    *See    generally    Troubleshoot    with    Pixel    Helper*,    TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en (last visited Feb. 17, 2026) (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).

Defendant's Pixel ID, whereas the "code" variable in *Figure 17* identifies the TikTok Pixel ID, both of which reference the Pixel ID as "CH5AHJRC77U83I05U4FG".

79. TikTok Pixel users make use of events to collect even more specific data on users' activities, including for the actions taken on a webpage (e.g., clicking a specific button or element, adding an item to a cart, and when a webpage with a URL containing a specified keyword is loaded onto a user's browser), the value of the purchase, and the product purchased.[22]

80. These event-triggers cause data to be sent as communications are received by users (through webpage loading events), and as communications are sent to the Website (through button clicking and similar events).

81. The TikTok Pixel also collects:

  a. The time website actions took place;

  b. The IP address (which is used to determine the geographic location of a user);

  c. Device information, including make, model, operating system, and browser information;

  d. Cookies that can be used to identify users; and

  e. Metadata and button clicks.[23]

82. The information the TikTok Pixel collects provides Defendant and TikTok with a better understanding of who Defendant's customers are, which webpages users have visited, and how they interact with the Website.

83. TikTok's "Advanced Matching" feature allows Defendant to "match customer information such as email and phone number along with actions people take on [the Website]."[24]

[22] *How to Set Up Events and Parameters with Events Builder*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Feb. 17, 2026) (describing how to designate events).
[23] *About TikTok Pixel*, TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Feb. 17, 2026).
[24] *About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Feb. 17, 2026).

Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[25] TikTok then provides Defendant with custom audiences based on website user events, like page views or purchases, to model lookalike audiences.[26] Lookalike audiences allow Defendant to retarget users who have already visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[27]

84.　　Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about hundreds of millions of Americans to identify users and develop their marketing profiles, improving Defendant's conversion rates and reducing overall advertising costs.[28]

85.　　Defendant used the TikTok Pixel to monitor and log, in real time from users' browsers, when users clicked on specific products, loaded webpages, added specific products to cart, and proceeded through the checkout process to payment and shipping.

86.　　The TikTok Pixel also captures users' identifying cookies (the _ttp cookie is used to identify TikTok users[29]), and hashed email, which can still be de-anonymized through the use of a tool called a "reverse lookup table."[30]

---

[25] *How to set up Automatic Advanced Matching*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Feb. 17, 2026).

[26] *Get started with the TikTok Pixel: a small business guide*, TIKTOK (Sept. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Feb. 17, 2026) (benefits of using the TikTok Pixel).

[27] *See* Lizzie Davey, *How to use TikTok Pixel: TikTok conversions tracking*, LEADSBRIDGE (May 2, 2025), https://leadsbridge.com/blog/tiktok-pixel/ (last visited Feb. 17, 2026).

[28] *Id.*

[29] *See G-Star Raw: List of Cookies* https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Feb. 17, 2026).

[30] *Can someone please explain reverse look up tables?*, SOFTWARE ENGINEERING, https://softwareengineering.stackexchange.com/questions/277152/can-someone-please-explain-reverse-look-up-tables (last visited Feb. 17, 2026).

87.    Plaintiffs had a reasonable expectation that the following information would not be exposed to the Tracking Tools placed by Defendant: (i) Plaintiffs' identifying information, (ii) information that designated Plaintiffs as interested in purchasing or otherwise as a purchaser of the Defendant's products, and (iii) IP address and identifier information relating to who Plaintiffs are, and who Plaintiffs were communicating with to obtain the products.

88.    Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and create and access vast amounts of data to run successful ad campaigns.[31]

89.    TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve its own products and services, including the sale of targeted advertising, and to generate its own benchmarking reports to share with other TikTok business customers.[32]

90.    In fact, TikTok admits that it gathers Website visitors' Sensitive Information via the TikTok Pixel and shares that Sensitive Information with third or fourth parties,[33] just as Plaintiffs' Sensitive Information was gathered and shared here.

91.    According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately links to data harvesting platforms that pick off usernames and passwords, credit card and banking information, and details about users' personal health."[34] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer[s] the data to locations around the globe," and does so "before users have a chance to accept cookies or otherwise grant consent."[35]

---

[31] *See Benefits of using the TikTok Pixel*, TIKTOK (Sept. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel?acq_banner_version=73412989 (last visited Feb. 17, 2026).

[32] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Dec. 22, 2025).

[33] *See Privacy Policy*, TIKTOK (Feb. 5, 2026), https://www.tiktok.com/legal/page/us/privacy-policy/en (last visited Feb. 26, 2026).

[34] *See* Aaron Katersky, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited Feb. 17, 2026).

[35] *Id.*

92.    An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:



*Figure 13 – Home page of the Website*



*Figure 14 – Using a browser's "developer tools" while visiting HP's webpage confirms the Website loading TikTok Pixel's code onto the user's browser, which caused the transmission of an HTTP Request to TikTok's servers.*

*Figure 15 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website, including Advanced Matching and AutoAdvancedMatching*

93.    The TikTok Pixel instantly sends communications to TikTok when a user views the page and tracks page interactions. The screenshots below show the sample webpage along with the webpage code, including the various TikTok scripts Defendant causes to run on users' browsers, and the electronic impulses sent to TikTok from users' browsers to aid TikTok's building of marketing profiles on users:



*Figure 16 – Sample product on the Website*

CLASS ACTION COMPLAINT

*Figure 17 – Information collected via the TikTok Pixel when a user visits the sample webpage from Figure 16*

94.     To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms"). But Plaintiffs and other Website visitors are never exposed to these terms (nor would they have any reason to look for them) as they form the agreement between Defendant and TikTok, which agreement is not even known to Plaintiffs and Website visitors

95.     The TikTok Terms inform website owners using TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[36]

96.     The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[37]

---

[36] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), (last visited Dec. 22, 2025).
[37] *Id.*

97. TikTok puts TikTok Pixel users, such as Defendant, on notice that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[38] TikTok makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

98. TikTok educates and reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[39]

99. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel and ignored TikTok's warnings to safely handle its users' data and warn their users that the Website would disclose their information in a manner that threatened their private information.

**B.    The Meta Pixel**

100. Facebook offers its own tracking pixel known as the Facebook or Meta Pixel (the "Meta Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

101. The Meta Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel and then add code to the website to make use of the Meta Pixel.[40]

102. Upon creating a Meta Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated.[41] This Pixel ID is used to initialize the Meta Pixel, either by allowing Meta to fetch a

---

[38] *Id.*

[39] *Id.*

[40] *Setup    and    install    the    Meta    Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142    (last visited Feb. 17, 2026).

[41] *Id.*

CLASS ACTION COMPLAINT

predetermined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[42]

103.    This Pixel ID must match "a known Pixel ID" in Meta's system,[43] and is transmitted by the Meta Pixel.[44]

104.    As Facebook notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[45]

105.    Defendant places the Meta Pixel on the Website to gather, collect, and then transmit user information to Facebook.[46] Defendant and Facebook use this information to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[47]

106.    The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[48]

107.    Once implemented on a website, the Facebook Pixel begins to share users' information the moment a user lands on the website.

[42] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Feb. 17, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").
[43] *Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Feb. 17, 2026).
[44] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Feb. 17, 2026).
[45] *Get Started*, FACEBOOK, (last visited Feb. 17, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").
[46] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK (last visited Feb. 17, 2026).
[47] *See Meta Pixel*, FACEBOOK (last visited Feb. 17, 2026).
[48] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Feb. 17, 2026).

108.    When a Facebook user logs onto Facebook, tracking cookies, including the "c_user" cookie, the data cookie, and the "fr" cookie, are automatically created and stored on the user's device.[49] These cookies allow Facebook to link the data it receives through the Meta Pixel to individual Facebook users.

109.    The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.

*Figure 18 – Sample c_user cookie, containing FID of test account created by Plaintiffs' counsel to investigate the Facebook Pixel*

110.    The FID can simply be appended to www.facebook.com/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Appending the FID from *Figure 18* to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) redirects the webpage straight to the Facebook profile associated with the UID, as depicted below:

---

[49] *Cookies Policy: What are cookies, and what does this* policy cover?, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Feb. 17, 2026).

CLASS ACTION COMPLAINT



*Figure 19 – Sample Facebook account created by Plaintiffs' counsel to investigate the Facebook Pixel, with FID highlighted in URL*

111.     The Meta Pixel tracks user-activity on web pages by monitoring events,[50] which, when triggered, causes the Pixel to automatically send data—users' Sensitive Information—directly to Facebook.[51] Examples of events utilized by websites include a user loading a page with a Pixel installed (the "PageView event").[52] The Website utilizes this PageView event.[53]

---

[50] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Feb. 17, 2026).

[51] *Id.*

[52] *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Feb. 17, 2026).

[53] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Feb. 17, 2026).

CLASS ACTION COMPLAINT

112. The Meta Pixel also to transmits Defendant's unique Pixel ID via the "id" parameter, which contains Defendant's Pixel IDs of "1524985691042566" and "1385816352923120" for the purpose of matching the harvested data to Defendant's Website.

113. Defendant uses the Meta Pixel to monetize Website users' Sensitive Information.

114. Facebook independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Facebook benefits from intercepting and analyzing users' Sensitive Information by refining its marketing algorithms and improving the effectiveness of its ad sales to all advertisers through Meta's social media platforms to target Meta's users, profiting from the ability to more accurately target potential customers.

115. Meta admits that it shares users' Sensitive Information with third and fourth parties,[54] just as Plaintiffs' Sensitive Information was shared here.

116. Defendant's use of the Facebook Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to purchasing the sample product on the Website from *Figure 16.*

---

[54] *See* *Privacy* *Policy,* META (Dec. 16, 2025), https://www.facebook.com/privacy/policy?section_id=4-HowDoWeShare (last visited Feb. 26, 2026).

CLASS ACTION COMPLAINT

*Figure 20 – Facebook Pixel tracking a user landing on the webpage from Figure 13 through the "PageView" event*

117.     When a business applies to use the Meta Pixel, it is provided with details about its functionality and its impact on private information.[55] Plaintiffs and Website users, however, are

---

[55] *See Get Started*, META, (last visited Feb. 17, 2026). (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

not provided this information and would have no reason to look for it, as they are not a party to Defendant's agreement with Facebook.

118. To make use of the Meta Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

119. The Facebook Terms inform website owners using the Meta Pixel that the employment of the Meta Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[56]

120. The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Pixel Event information]."[57]

121. Facebook directs parties implementing the Meta Pixel—here, Defendant—to encrypt request information[58] *before* data can be shared.[59]

122. Facebook further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Facebook.

123. Facebook educates or reminds Meta Pixel users of their responsibility to inform their users of their website's data sharing and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with any third party.[60]

124. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result

---

[56] *Meta Business Tools Terms*, FACEBOOK (Nov. 3, 2025), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Feb. 17, 2026).

[57] *Id.*

[58] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method, which makes users' information visible. *See id.*

[59] *Id.*

[60] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Feb. 17, 2026).

CLASS ACTION COMPLAINT

from use of the Meta Pixel and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

### C.    Google Analytics

125.    Google's Tracking Tools are not implemented into websites by Google and require several affirmative steps on the part of the website owner to implement and to effectuate their data sharing.

126.    Defendant embeds Google Analytics in its Website to enable Google to intercept users' Sensitive Information.

127.    Like the Facebook Pixel, Google Analytics ("GA") invisibly collects data about user interactions with a website, including link clicks, button clicks, form submissions, conversions, shopping cart abandonment, adding items to carts, removing items from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.

128.    Google admits that it shares users' Sensitive Information with third and fourth parties,[61] just as Plaintiffs' Sensitive Information was shared here.

129.    The data collected through GA is sent back to Google, which associates the activity with the website from which it was collected. Notably, Google notifies web developers that they should provide "users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."

130.    In short, the use of GA involves specific data-collection practices, preconfigured settings, and known transmission paths for user data. Google acknowledges the legal risks associated with its tracking tools and explicitly shifts the responsibility for informing users and obtaining any required consent onto website operators like Defendant.

---

[61] *See Privacy & Terms*, GOOGLE, https://policies.google.com/privacy?hl=en#infosharing (last visited Feb. 26, 2026).

131.    Here, Defendant added GA to its Website by (1) creating an Analytics account; (2) designating their Website as a property; (3) adding a data stream to determine what information to collect; and (4) adding the GA tag to its website.

132.    Defendant's decision to implement GA into the Website resulted in the interception and redirection of Plaintiffs' search terms to Google, as depicted from the example taken directly from the Website below:



*Figure 21 – Test search made on the Website resulted in Google Analytics intercepting search terms "Turkey-Bacon Ranch" and redirecting them to Google*

133.    After arriving, Google provides analysis and feedback, which helps Defendant monetize the collected information through targeted advertising.

134.    On December 19, 2024, Google announced that organizations using its advertising products can use fingerprinting techniques beginning on February 16, 2025.[62]

135.    "Fingerprinting involves the collection of pieces of information about a device's software or hardware, which, when combined, can uniquely identify a particular device and user,"

---

[62] Pieter Arntz, *Google now allows digital fingerprinting of its users*, MALWAREBYTES (Feb. 19, 2025),          https://www.malwarebytes.com/blog/news/2025/02/google-now-allows-digital-fingerprinting-of-its-users (last visited Feb. 10, 2026).

explained Stephen Almond, executive director of regulatory risk at the International Commissioner's Office ("ICO").[63]

136.    Digital fingerprinting essentially creates a unique digital ID for a user and their device based on various pieces of information collected when users browse the internet, including a user's operating system (e.g., Windows, Android, iOS), browser type (e.g., Chrome, Safari, Firefox) and version, IP address, installed browser plugins, time zone, and language settings, among others.[64]

137.    In addition to device identifiers, fingerprinting collects all the websites and apps the user uses, creating a detailed map for Google to follow and analyze, enabling a profile to be built of everything the Subscriber likes and is likely to buy.[65]

138.    Even Google has raised concerns about digital fingerprinting in the past, warning it "subverts user choice and is wrong."[66]

139.    In changing its policy regarding fingerprinting, Google vaguely claims it is investing in privacy-enhancing technologies (PETs) to protect users' privacy, providing few specifics about how PETs do so.[67]

---

[63] Stephen Almond, *Our response to Google's policy change on fingerprinting*, INT'L COMMISSIONER'S OFFICE (Dec. 19, 2024), https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2024/12/our-response-to-google-s-policy-change-on-fingerprinting/ (last visited Feb. 10, 2026).

[64] Pieter Arntz, *Google now allows digital fingerprinting of its users*, MALWAREBYTES (Feb. 19, 2025), (last visited Feb. 10, 2026).

[65] Zak Doffman, *Google's Fingerprinting Returns in 8 Weeks And It Will Track Your Devices*, FORBES (Dec. 21, 2024 2:37 PM), https://www.forbes.com/sites/zakdoffman/2024/12/21/forget-chrome-google-will-start-tracking-you-and-all-your-smart-devices-in-8-weeks/ (last visited Feb. 10, 2026); Zak Doffman, *Google Starts Fingerprinting Your Devices in 10 Days*, FORBES (Feb. 8, 2025), https://www.forbes.com/sites/zakdoffman/2025/02/08/forget-chrome-google-starts-tracking-all-your-devices-in-10-days/ (last visited Feb. 10, 2026).

[66] *Id.*

[67] *Id.*

43
CLASS ACTION COMPLAINT

140. The ICO finds fingerprinting an unfair means of tracking users online, "because it is likely to reduce people's choice and control over how their information is collected."[68]

141. The ICO explains:

> [W]hen you choose an option on a consent banner or "clear all site data" in your browser, you are generally controlling the use of cookies and other traditional forms of local storage. Fingerprinting, however, relies on signals that you cannot easily wipe. So, even if you "clear all site data" the organization using fingerprinting techniques could immediately identify you again.[69]

142. As a result of Defendant's use of Google's GA tool, users, including Plaintiff, lost control of their Sensitive Information and had marketing profiles developed through the use of their Sensitive Information, allowing Google and Defendant to benefit.

**D.    The Reddit Pixel**

143. Additionally, Defendant has installed a tracking pixel on its Website created by social media platform Reddit (the "Reddit Pixel").

144. The Reddit Pixel is a piece of code that can be added to a website by a website owner to allow Reddit to track users on the website and record the actions the visitors take from users' browsers.[70] The harvested data is subsequently used by Reddit and the website owner to serve targeted ads to website users on Reddit.

145. The Reddit Pixel is also used in conjunction with Reddit's Conversion API (CAPI) to track specific actions that users take on the websites, such as viewing a page, submitting a search in the website's search bar, adding a product to the visitor's cart, checking

---

[68] *Our response to Google's policy change on fingerprinting*, INT'L COMMISSIONER'S OFFICE (Dec. 19, 2024), https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2024/12/our-response-to-google-s-policy-change-on-fingerprinting/ (last visited Feb. 10, 2026).

[69] *Google's Fingerprinting Returns in 8 Weeks And It Will Track Your Devices*, FORBES (Dec. 21, 2024), (last visited Feb. 10, 2026).

[70] *About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Feb. 17, 2026); *Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Feb. 17, 2026).

out, and other specified events.[71] Because the Reddit CAPI operates on website servers, users cannot verify its use.

146.     Reddit makes use of a website owner's pixel ID to determine which data should be tracked when sending the code for the Pixel to the user's browser,[72] and to specify "which business account should receive" the user's tracking data.[73]

147.     Reddit admits that it shares users' Sensitive Information with third and fourth parties,[74] just as Plaintiffs' Sensitive Information was shared here.

148.     In Defendant's use of the Reddit Pixel, Defendant configured the Reddit Pixel to include a parameter called "id" which identifies Defendant's Reddit Pixel ID as "t2_7xrlazd9". This data is sent both when receiving communications from the Website and as users send communications to the Website.

149.     Website owners, like Defendant, can enable a feature of the Reddit Pixel known as "Auto-Advanced Matching" to determine the exact identity of Reddit users who visit the website.

150.     Auto-Advanced Matching automatically scrapes a website for any email addresses typed or inserted by a user and sends that email information to Reddit.[75]

151.     In addition to email addresses, a website owner can enable the Reddit Pixel and the CAPI to send additional personal information to Reddit, known as "match keys," to identify website users.[76]

---

[71] *Conversion Events*, REDDIT, https://business.reddithelp.com/articles/Knowledge/supported-conversion-events (last visited Feb. 17, 2026).
[72] *See Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Feb. 17, 2026).
[73] *About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Feb. 17, 2026).
[74] Reddit Privacy Policy, REDDIT (Jan. 6, 2026), https://www.reddit.com/policies/privacy-policy (last visited Feb. 26, 2026).
[75] *Auto-Advanced Matching*, REDDIT, https://business.reddithelp.com/s/article/automated-advanced-matching (last visited Feb. 17, 2026).
[76] *About Match Keys*, REDDIT, https://business.reddithelp.com/s/article/about-match-keys#customer-match-keys-and-identifiers (last visited Feb. 17, 2026).

152. IP addresses are match keys that website owners are *required* to send to Reddit. Website owners and Reddit may also use other match keys, including:

      a.    Email addresses;

      b.    Phone numbers;

      c.    Mobile Advertising IDs (a unique identifier for a mobile user);

      d.    Reddit Click IDs (to attribute click conversions more accurately);

      e.    External IDs (an advertiser-assigned identifier that enhances match accuracy);

      f.    Reddit UUIDs (a unique ID generated by the Reddit Pixel);

      g.    User Agents (which identify the software the user is using to access the website); and

      h.    The visitor's screen dimensions.[77]

153. This data can be used by Reddit to match an otherwise anonymous website visitor to their Reddit account, or even to identify them outright, associating their identity with their activity on the website.

154. Reddit uses this data to help advertisers, including Defendant, gauge the effectiveness of their ad campaigns, improve their ability to attribute activity to specific campaigns, track users across devices, and create more precisely targeted campaigns.[78]

155. Additionally, Reddit employs this data to optimize its own ad placements and to develop new services.[79]

156. Defendant's use of the Reddit Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to searching for and purchasing a product on the Website.

---

[77] *Id.*

[78] *Id.*

[79] *Reddit Privacy Policy*, REDDIT (last revised Jan. 6, 2026), https://www.reddit.com/policies/privacy-policy#policy-h2-4 (last visited Feb. 17, 2026).

*Figure 22 – Reddit Pixel tracking a user visiting the webpage from Figure 14 through the "PageVisit" event*

157.    To utilize the Reddit Pixel, Defendant agreed to Reddit's Business Tool Terms (the "Reddit Terms").

158.    The Reddit Terms inform website owners, such as Defendant, that the employment of the Reddit Pixel will result in Reddit obtaining users' data, including users' website actions, email addresses, cookie IDs, and device IDs, among other "matching parameters."[80]

159.    The Reddit Terms make clear that the onus is on the Defendant to provide all necessary transparency notices and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Reddit.

160.    The Reddit Terms explicitly condition the use of the Reddit Pixel on website owners' warranties that they: (i) provide "prominent and legally-sufficient notice" of the Reddit Pixel's data sharing to users; (ii) provide "clear, prominent and legally sufficient instructions regarding how to opt out of data collection and use of such data collection and use;" and (iii) do not share "any data related to users who have not provided consent[.]"[81]

161.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Reddit Pixel and ignored Reddit's warnings to safely handle its users' data and

---

[80] *Reddit Business Tool Terms*, REDDIT (effective date Aug. 7, 2025; last revised July 7, 2025), https://business.reddithelp.com/s/article/Reddit-Business-Tool-Terms (last visited Feb. 17, 2026).
[81] *Id.*

47
CLASS ACTION COMPLAINT

to warn its users that the Website would disclose information in a manner that threatened users' private information.

**E.      The Twitter Pixel**

162.    X Corp. f/k/a Twitter ("Twitter") also offers its own website tag that can be implemented into websites to track users' site actions or conversions (the "Twitter Pixel").

163.    To make use of the Twitter Pixel, website owners, such as Defendant, must take several affirmative steps: They must generate the Twitter Pixel and create events to track, implement the Twitter Pixel base code across their website, and implement event code in key locations on their website, like when a user makes a purchase.[82]

164.    With each event, website owners like Defendant can select the user action they want Twitter to track and the parameters to describe the action being tracked.

165.    Events can include viewing a page, making a purchase, adding an item to the shopping cart, using the search bar, adding a product to the wish list, adding payment information, and customizing a product.[83]

166.    Parameters can include the contents of the action, the search terms used on the website, the email address of the user taking the action, the value of the product purchased, and the currency the purchase was made in.[84]

167.    As soon as the Twitter Pixel is placed on a website, it begins to collect information, including the cookie IDs of users, to match them to Twitter users for the purpose of developing custom audiences and improving marketing and advertising capabilities of the website and Twitter.[85]

---

[82] *X Pixel*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited September 17, 2025).

[83] *Event Types and Parameters*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited Feb. 17, 2026).

[84] *Id.*

[85] *Website Activity Custom Audiences*, X BUSINESS, https://business.x.com/en/help/campaign-setup/campaign-targeting/custom-audiences/website-activity (last visited Feb. 17, 2026).

CLASS ACTION COMPLAINT

168.   Twitter admits that it shares users' Sensitive Information with third and fourth parties,[86] just as Plaintiffs' Sensitive Information was shared here.

169.   Twitter allows website owners, such as Defendant, to create "Website Activity Audiences," a type of custom audience, which enables Twitter to collect and analyze user activity for users who have visited or taken certain actions on Defendant's Website. Once an audience is created and the Twitter Pixel collects 100 Twitter users, the audience will be ready to use for targeting in ad campaigns.[87]

170.   The data collected by the Twitter Pixel informs both Defendant and Twitter how to optimally target custom audiences with advertising based on the geo, gender, age, and device criteria specified by Defendant. An image of the invasive Twitter code secretly embedded on Defendant's Website can be seen here, which shows the Twitter Pixel instantly sending communications to Twitter from users' browsers to add to its collection of user behavior when a user visits the sample webpage in *Figure 16*:



*Figure 23 - Twitter Pixel active on the Website*

---

[86] *See Privacy Policy*, X (Jan. 15, 2026), https://x.com/en/privacy (last visited Feb. 26, 2026).
[87] *Id.*

171.    Twitter is transparent that Twitter will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[88]

172.    To use the Twitter Pixel, Defendant agreed to Twitter's policies for conversion tracking and custom audiences (the "Twitter Terms").[89] But the Twitter Terms are not provided to Website users.

173.    Twitter obligates Twitter Pixel users, such as Defendant, that they "must provide their application customers with legally sufficient notice that they are working with third parties to collect customer data through their application for purposes of conversion tracking and serving ads targeted to customers' interests, and obtain legally sufficient consent from their customers for these activities."[90]

174.    Twitter makes clear that the onus is on the Defendant to provide all necessary transparency notices and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Twitter.[91]

175.    Twitter educates or reminds Twitter Pixel users of their obligation to be honest with their consumers and not to select "targeting criteria that could reveal sensitive information" about consumers.[92]

176.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Twitter Pixel and ignored Twitter's warnings to safely handle its users' data and warn its users that the Website would disclose their information in a manner that threatened their Sensitive Information.

---

[88] *Website Activity Custom Audiences*, X BUSINESS (last visited Feb. 24, 2026).
[89] *Policies for conversion tracking and custom audiences*, X BUSINESS, https://business.x.com/en/help/ads-policies/campaign-considerations/policies-for-conversion-tracking-and-custom-audiences (last visited Feb. 24, 2026).
[90] *Id.*
[91] *Id.*
[92] *Id.*

**F.    The Trade Desk Pixel**

177.    The Trade Desk is a demand-side platform ("DSP"), meaning it provides automation software to assist advertisers in purchasing advertisements.[93] The Trade Desk provides advertisement purchasers with software tools to manage, analyze, and optimize digital advertising campaigns across multiple channels and inventory sources.[94] As a DSP, The Trade Desk works with supply-side platforms ("SSPs"), which are used to manage the supply of advertising inventory for publishers and other entities that sell advertising space on their websites.[95] The Trade Desk is integrated with many supply-side platforms that rely on advertising spend generated by advertisers using The Trade Desk.[96]

178.    The Trade Desk offers technologies, products, and services designed to personalize the delivery of digital content to individual users.[97] As to personalized advertisements delivered to users, Jeff Green, Chief Executive Officer of The Trade Desk, described Trade Desk's Unified ID 2.0 marketing technology as follows: "[w]e will have effectively solved the identity matching challenge of the entire open internet on a scale well beyond anything cookies

[93] *What is a demand-side platform (DSP)*, ADJUST, https://www.adjust.com/glossary/demand-side-platform/ (last visited Feb. 17, 2026).

[94] *Trackers: The Trade Desk (adsrvr.org)*, BETTER.FYI, https://better.fyi/trackers/adsrvr.org/ (last visited Feb. 17, 2026).

[95] *What is a Supply-Side Platform?*, PUBLIFT, https://www.publift.com/adteach/what-is-a-supply-side-platform (last visited Feb. 17, 2026).

[96] *Id*.

[97] *News Details: The Trade Desk Reports Fourth Quarter and Fiscal Year 2022 Financial Results; Announces $700 Million Share Repurchase Program*, THETRADEDESK: INVESTOR RELATIONS (Feb. 15, 2023) https://investors.thetradedesk.com/news-and-events/news-details/2023/The-Trade-Desk-Reports-Fourth-Quarter-and-Fiscal-Year-2022-Financial-Results-Announces-700-Million-Share-Repurchase-Program/default.aspx#:~:text=View%20all%20news-,The%20Trade%20Desk%20Reports%20Fourth%20Quarter%20and%20Fiscal%20Year%202020 22,%24700%20Million%20Share%20Repurchase%20Program&text=Q4%20revenue%20grew %2024%25%20year,over%20year%20to%20%241%2C578%20million. (last visited Feb. 17, 2026).

have ever accomplished, and all while providing consumers with much greater control over their privacy."[98]

179.    Among the tracking technologies offered by The Trade Desk and employed by the Website for tracking user behavior and collecting data for targeted advertising is the Trade Desk Universal Pixel ("TTD Pixel").[99] The TTD Pixel is enabled by placing TTD Pixel code within a website's code, which enables the capture of data on each page of the website and across multiple websites.[100] Trade Desk's TTD Pixel is designed to collect and transmit user data that marketers use to measure, manage, and optimize programmatic advertising campaigns.[101]

180.    The TTD Pixel, like other pixels, is a tracking tool that can be integrated with the Trade Desk's platform (the "Platform").[102] The TTD Pixel allows advertisers and site operators to "spend less time placing tags, gain more visibility into user data, and analyze reporting at a more granular level . . . all with the placement of a single tag."[103] The TTD Pixel collects information, including demographics, browsing behavior, and conversion events. The precise categories of information collected through the TTD Pixel in this case are described in further

[98] Chris Kelly, *Trade Desk revenue up 24% as advertisers continue shift to CTV, retail media*, MARKETINGDIVE (FEB. 15, 2023) https://www.marketingdive.com/news/trade-desk-earnings-q4-ctv-retail-media/642825/ (last visited Feb. 17, 2026).

[99] *About The Trade Desk Universal Pixel*, TEALIUM, https://tealium.com/integrations/the-trade-desk-universal-pixel/ (last visited Feb. 17, 2026).

[100] *Universal Pixel*, THETRADEDESK, https://www.lockheedmartin.com/content/dam/lockheed-martin/eo/documents/contact/TTD_UniversalPixel_Overview.pdf (last visited Feb. 17, 2026).

[101] Mason Widmer, *4 Vital Best Practices for Using The Trade Desk + A Top Tip*, GRAPESEED MEDIA (Nov. 6, 2024), https://grapeseedmedia.com/blog/trade-desk-best-practices/ (last visited Feb. 17, 2026).

[102] The Trade Desk platform refers to the Trade Desk's self-service technologies for buying and managing digital advertising campaigns across various channels and formats (the "Platform"). The Platform allows advertisers to use data to better target specific audiences via the TTD Pixel and other technologies. The Platform also provides real-time bidding, where advertisers bid on ad impressions, and can access insights into impressions, clicks, conversions, and audience engagement metrics. The Platform enables cross-device advertising on smartphones, tablets, TVs, and desktop computers. Overall, the Platform provides advertisers with advertising capabilities, audience targeting, real-time bidding, data analytics, and control over their digital ad campaigns.

[103] *Universal Pixel*, THETRADEDESK, https://www.lockheedmartin.com/content/dam/lockheed-martin/eo/documents/contact/TTD_UniversalPixel_Overview.pdf (last visited Feb. 17, 2026).

detail below.[104] The TTD Pixel is not limited to computer or browser-based browsing; it is capable of collecting information from mobile platforms, including how a user interacts with mobile applications, and specific details regarding the mobile device being used to access the content and the applications.[105]

181.    An advertiser or website operator that uses the Platform to run campaigns can leverage the TTD Pixel to collect data regarding how users interact across websites, mobile applications, television, and other technologies.[106]

182.    Defendant's integration of the TTD Pixel provides benefits to The Trade Desk and Defendant.

183.    The first benefit provided by the TTD Pixel to The Trade Desk is data collection. This data allows The Trade Desk to segment user information to create target audiences and track conversions.[107] For example, the TTD Pixel enables The Trade Desk to collect user data, including demographic information, browsing behavior, preferences, and interactions with websites.[108] This data is then sent to an SSP, which analyzes bids from multiple DSP, such as The Trade Desk, and facilitates the targeting of users based on their information.[109] The Trade Desk relies on this information for its business operations.

---

[104] *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS, https://audiencex.com/insights/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited Feb. 17, 2026).
[105] *Privacy and The Trade Desk Platform*, THETRADEDESK, https://www.thetradedesk.com/us/privacy (last visited Feb. 17, 2026).
[106] *Id.*
[107] Erin Jeffery, *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS (Sept. 3, 2020) https://audiencex.com/insights/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited Feb. 17, 2026).
[108] Andy Pitre, *Ad Tracking: What It Is & How to Do It*, HUBSPOT: BLOG (updated Mar. 10, 2022) https://blog.hubspot.com/blog/tabid/6307/bid/7249/a-marketer-s-guide-to-tracking-online-campaigns.aspx (last visited Feb. 17, 2026).
[109] *Programmatic Advertising: Your Guide to DMPs, DSPs, and SSPs*, GROWTH MARKETING GENIE, https://growthmarketinggenie.com/blog/programmatic-advertising-dmps-dsps-ssps/ (last visited Feb. 17, 2026).

184.    The TTD Pixel also enables the Trade Desk to retarget users by creating lookalike audiences, as the TTD Pixel is "essentially [] just storing a group of people and information about them."[110] A lookalike audience is a group of individuals who are likely to be interested in a business because they share similarities with the business's existing customers.[111] By developing lookalike audiences, the Trade Desk enhances its ability to bid for advertising space from SSPs by identifying website users who are more likely to generate clicks or conversions based on shared characteristics with existing customers.[112]

185.    Finally, because Trade Desk's primary business model involves charging clients or advertising publishers a percentage of gross spending on the Trade Desk platform, improvements in advertising effectiveness increase Trade Desk's revenue. When advertising targeting efficiency improves by increasing advertising conversion rates (the rate at which clicks turn to sales)[113] advertisers are more likely to shift additional business to Trade Desk, resulting in increased revenue derived from ad sales. [114]

186.    On the Website, the TTD Pixel is configured to covertly intercept Search Terms after a user submits those terms through the Website's search bar and before the resulting search responses are transmitted to and loaded on the user's device, as depicted below, thereby capturing the contents of the user's search communications in transit:[115]

---

[110] *What are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS (Sept. 3, 2020) (last visited Feb. 17, 2026).

[111] *Facebook Lookalike Audiences & When to Use Them*, BLACKBOX, https://blackboxdms.com/leveraging-your-data-how-to-build-facebook-lookalike-audiences-when-to-use-them/ (last visited Dec. 23, 2025).

[112] *Id.*

[113] *What is a conversion rate (CVR)?*, ADJUST, https://www.adjust.com/glossary/conversion-rate/ (last visited Feb. 17, 2026).

[114] Trevor Jennewine, *How Does The Trade Desk Make Money?*, THE MOTLEY FOOL (Oct. 27, 2021 7:35 am EDT) *available at* https://www.nasdaq.com/articles/how-does-the-trade-desk-make-money-2021-10-27 (last visited Feb. 17, 2026).

[115] Here, a test search was made using "blue jeans" as the Search Terms.



*Figure 24 – Inputting Search Terms into the Search Bar results in TTD Pixel Intercepting the Search Terms*

### G.    New Relic Browser Monitoring

187.    Additionally, Defendant has installed performance and analysis software on its Website, created by data company New Relic.

188.    New Relic offers Website owners a suite of programs they can use as a platform for all their data, including metrics, events, logs, and traces, all of which can be analyzed with New Relic's analysis tools.[116]

189.    New Relic provides website owners like the Defendant with tools to monitor users' browser activity on their websites. One of these tools is APM, which allows website owners to track website performance and the end-user experience in their browsers.[117]

190.    To measure this performance and user experience, the New Relic browser monitoring is loaded onto a website when the user loads a webpage.

191.    The New Relic browser monitoring intercepts and transmits various metrics to New Relic, including the URL of the webpage a user is viewing and session identifiers that identify the user. These identifiers include the "s" parameter, which is passed through the HTTP request that New Relic browser monitoring makes, and the JSESSION ID cookie collected by the New Relic browser monitoring.

---

[116] *Free developers to build the next great thing*, NEWRELIC, https://newrelic.com/about, (last visited Feb. 17, 2026).

[117] *How to use browser monitoring to improve your website's performance*, NEWRELIC, https://docs.newrelic.com/docs/browser/browser-monitoring/getting-started/introduction-browser-monitoring/ (last visited Mar. 10, 2026).

192.    The JSESSION ID cookie is used to store a session identifier for the New Relic browser monitoring.[118] The "s" parameter is a session identifier that is set on the browser by the New Relic browser monitoring.[119]

193.    Defendant's use of the New Relic browser monitoring can be seen on the Website in the figures below.

*Figure 25– The New Relic browser monitoring on the Website*

---

[118]    *Browser        agent        cookies        (deprecated),*        NEWRELIC, https://docs.newrelic.com/docs/browser/browser-monitoring/page-load-timing-resources/new-relic-cookies-used-browser/#jsessionid (last visited Mar. 10, 2026).

[119]    *Session    Tracking,*    NEWRELIC,    https://docs.newrelic.com/docs/browser/browser-monitoring/page-load-timing-resources/cookie-collection-session-tracking/?utm_source=chatgpt.com (last visited Mar. 10, 2026).

| | | |
|---|---|---|
| | Query String Parameters | View source    View decoded |
| a | 601394608 | |
| sa | 1 | |
| v | 1.263.0 | |
| t | Unnamed%20Transaction | |
| rst | 520 | |
| ck | 0 | |
| s | 392e6116502eded2 | |
| ref | https://www.hp.com/us-en/shop/pdp/victus-by-hp-156-inch-gaming-laptop-pc-a8vy4av-1 | |
| ptid | 8713c3a2b4176564 | |
| af | err,spa,xhr,stn,ins | |
| be | 159 | |
| fe | 304 | |
| dc | 235 | |
| fsh | 0 | |
| perf | %7B%22timing%22:%7B%22of%22:1770914004197,%22n%22:0,%22u%22:180,%22ue%22:180,%22f%22:3,%22dn%22:3,%22dne%22:3,%22c%22:3,%22s%22:3,%22ce%22:3,%22rq%22:8,%22rp%22:159,%22rpe%22:182,%22di%22:391,%22ds%22:391,%22de%22:394,%22dc%22:457,%22l%22:461,%22le%22:463%7D,%22navigation%22:%7B%22ty%22:1%7D%7D | |
| fp | 400 | |
| fcp | 400 | |
| timestamp | 1770914004695 | |

*Figure 26 – The Payload of the New Relic browser monitoring on the Website*

194.    As shown in the figures above, the New Relic browser monitoring transmits both the URL and persistent session identifiers to New Relic, tracking users on the Website.

195.    New Relic admits that it shares users' Sensitive Information with third and fourth parties,[120] just as Plaintiffs' Sensitive Information was shared here.

196.    The New Relic Terms explicitly condition the use of New Relic services, including browser monitoring, on website owners' warranties that they: (i) have "all necessary rights, consents, and permissions to grant New Relic the rights in Section 2.2 (Use of Customer Data to Provide the Service); and (ii) "use and submit Customer Data to the Service, all without

---

[120] *See General Data Privacy Notice*, NEW RELIC (Feb. 23, 2026) https://newrelic.com/termsandconditions/privacy (last visited Feb. 26, 2026).

CLASS ACTION COMPLAINT

violating or infringing any applicable laws, third-party rights (including intellectual property, publicity, or privacy rights), or any terms or policies governing Customer Data."[121]

197.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the New Relic browser monitoring, and ignored New Relic's warnings to safely handle its users' data and to only allow New Relic to access user data in compliance with applicable privacy laws.

### H.    Bazaarvoice Pixel

198.    Defendant has also installed a pixel created by the ratings and review platform Bazaarvoice.

199.    Bazaarvoice's main business is implementing review platforms on websites, allowing website owners to easily manage and track reviews for their products.[122]

200.    However, Bazaarvoice also offers website owners Bazaarvoice Analytics integration, also known as the BV Pixel. The BV Pixel allows website owners to collect and monitor the behavior of users on their website.[123]

201.    The BV Pixel can capture a variety of user events, such as when a user purchases a product, interacts with Bazaarvoice user reviews, or views a webpage containing Bazaarvoice content, such as a product page with reviews.[124]

---

[121]    *Terms    of    Service,*    NEW    RELIC    (Oct.    21,    2021), https://newrelic.com/termsandconditions/unpaid#:~:text=Customer%20is%20responsible%20for%20its%20configuration%20choices%2C%20and%20any%20risks,will%20comply%20with%20the%20Documentation. (last visited Mar.10, 2026).

[122]*Home*, BAZAARVOICE, https://www.bazaarvoice.com/ (last visited Feb. 12, 2026).

[123]    *Bazaarvoice Analytics integration (BV Pixel)*, BAZAARVOICE (updated Feb. 27, 2025) https://docs.bazaarvoice.com/articles/#!ratings-reviews-legacy-prr/bv_pixel_analytics    (last visited Feb. 17, 2026)

[124]    *BV    Pixel*,    BAZAARVOICE    (updated    Feb.    27,    2025) https://docs.bazaarvoice.com/articles/#!ratings-reviews-legacy-prr/bvpixel/a/steps-to-implement-bv-pixel (last visited Feb. 17, 2026).

202.    The BV Pixel also intercepts personally identifiable information when the website owners configure it to do so. When a user triggers a transaction or conversion event, the BV Pixel is required to send the user's email address, locale, nickname, and "userId."[125]

203.    Bazaarvoice also uses cookies to consistently track users when they visit a website. These cookies are first-party cookies, as they are placed by the website, and allow Bazaarvoice to track and identify users.[126]

204.    Two cookies that are used by Bazaarvoice to track users are the BVBRANDID cookie, which persists for one year, and the BVBRANDSID cookie, which persists for the user's browsing session.[127]

205.    Bazaarvoice warns website owners that "these cookies can only be set if the site visitor has given consent through a cookie consent panel on your website."[128]

206.    Defendant's use of the BV Pixel on the Website can be seen in the figures below.



*Figure 27 – The BV Pixel on the Website*

---

[125] *Id.*

[126]    *Bazaarvoice cookies*, BAZAARVOICE (updated Feb. 12, 2026) https://docs.bazaarvoice.com/articles/#!portal-basics/cookies/q/session/qp/1/qid/239076 (last visited Feb. 17, 2026).

[127] *Id.*

[128] *Id.*

*Figure 28(1 of 2)– The Payload for the BV Pixel on the Website*

*Figure 28(2 of 2) – The Payload for the BV Pixel on the Website*

207.    These figures show that Defendant implemented the BV Pixel on the Website, which intercepted and transmitted the contents of users' communications with the Website, along with identifying cookies, to Bazaarvoice.

208.    Defendant intentionally placed the Bazaarvoice identifying cookies on the Website, as shown in the figure below.



*Figure 29 – First-party cookies placed by Defendant on the Website, including the BV Pixel cookies*

209.    *Figure 29* shows hp.com placing the BVBRANDID and BVBRANDSID first-party cookies, allowing Bazaarvoice to track individual users on the Website.

210.    Bazaarvoice admits that it shares users' Sensitive information with third and fourth parties,[129] just as Plaintiffs' Sensitive Information was shared here.

211.    Bazaarvoice educates or reminds BV Pixel users of their obligation to be honest with their consumers and to "maintain a privacy policy that accurately reflects your use of the content received, retrieved, accessed, and transferred through the Bazaarvoice API."[130]

---

[129]    *See    Privacy    Policy*, BAZAARVOICE    (Feb.    14,    2024), https://www.bazaarvoice.com/legal/privacy-policy/ (last visited Feb. 26, 2026).
[130]    *See    API    Terms    of    Use*, BAZAARVOICE    (Sept.    15,    2025) *https://www.bazaarvoice.com/legal/terms-of-use/api/* (last visited Mar. 10, 2026).

212. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the BV Pixel and ignored Bazaarvoice's warning to warn its users that the Website would disclose their information in a manner that threatened their Sensitive Information.

## V. Defendant Violated CIPA and the Federal Wiretap Act

213. Courts analyze claims under CIPA § 631 using the same framework applied to claims under the federal Wiretap Act. *See Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020).

214. CIPA § 631(a) prohibits several distinct and independent forms of unlawful interception, including: (1) intentionally tapping or making an unauthorized connection with a communication; (2) willfully attempting to read or learn the contents or meaning of a communication while it is in transit; and (3) using or communicating information obtained through such interception. Section 631(a)(iv) separately imposes liability on any party who aids, agrees with, employs, or conspires with another to commit any of those acts.

215. Similarly, the federal Wiretap Act prohibits the intentional interception[131] of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

### A. Tracking Entities Improperly Intercepted and Learned the Contents of Communications in Transit

216. Transmitted URLs that include both the path and query string reflect the substance of a user's communication and therefore constitute content.

217. Here, the network requests intercepted by the Tracking Entities included detailed Request URLs containing the names and file locations of webpages, products users browsed on

---

[131] "[I]ntercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

the Website, identifying information in the form of cookies, in addition to user activity information that indicates users' commercial activity and purchases.

218.    The Tracking Tools intercepted the contents of Plaintiffs' communications contemporaneously with Plaintiffs' interactions with the Website. The Tracking Tools began transmitting data to the Tracking Entities as soon as the Tools loaded onto Plaintiffs' browsers, and additionally transmit data at the moment Plaintiffs submitted information through the Website.

219.    This interception, duplication, and transmission occurred inside Plaintiffs' browsers, before the communications fully reached users' devices, or otherwise before the communications were transmitted from users' devices and therefore occurred while the communications were in transit.

220.    The Tracking Entities were third parties to Plaintiffs' communications with Defendant, and intercepted, read, duplicated, and retransmitted users' data while it was in transit.

221.    Defendant's deployment of the Tracking Tools enabled Tracking Entities to intercept Request URLs that specified the content Plaintiffs accessed on the Website, in violation of CIPA § 631 and the Federal Wiretap Act 18 U.S.C. § 2511(1)(a).

**B.     Defendant Aided and Abetted Third-Party Interceptions**

222.    A party violates CIPA § 631 and the Federal Wiretap Act 18 U.S.C. § 2511(1)(a) not only by directly intercepting communications, but also by knowingly permitting or facilitating third-party interception. "[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap." *Yoon v. Lululemon USA, Inc.,* 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021).

223.    Defendant knowingly procured the Tracking Entities to embed the Tracking Tools in its Website, enabling the Tracking Entities to intercept the contents of Plaintiffs' communications with the Website.

224.    CIPA § 631(a) requires the prior consent of all parties to the communication.

225.    The Federal Wiretap Act 18 U.S.C. § 2511(2)(d) requires the prior consent of at least one party to the communication.

226.    Defendant did not obtain Plaintiffs' express or implied consent to allow the Tracking Entities to intercept those communications, before or after the interceptions occurred, and Defendant's consent was limited to the Terms provided by the Tracking Entities.

**C.     Defendant Used Improperly Intercepted Communications**

227.    California and federal law prohibit the use of improperly intercepted communications. *See, e.g.*, Cal. Penal Code § 631(a); 18 U.S.C. § 2511(1)(d).

228.    Defendant made use of the Sensitive Information intercepted by Tracking Entities for marketing purposes, such as targeted advertising aimed at its users, including Plaintiffs.

229.    Defendant was made aware of how the Tracking Tools operated, how information would be collected from Plaintiffs' devices, and implemented the Tracking Tools in a way that resulted in the Tracking Entities intercepting Plaintiffs' Sensitive Information.

230.    Plaintiffs' Sensitive Information was then processed by Tracking Entities into marketing profiles of Defendant's users, including Plaintiffs, which Defendant then used to improve its marketing efforts and target users, including Plaintiffs, with advertising.

**D.     The Tracking Tools are Trap and Trace and/or Pen Register Devices.**

231.    California law defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

232.    California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

233. The Tracking Tools are processes to identify the source of electronic communication by capturing incoming electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the website is collaborating with the Tracking Entities to obtain their phone number and other identifying information. As such, it is a "trap and trace" device.

234. The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses. In fact, they are designed specifically for that purpose. The IP addresses, detailed URLs, cookies, and Pixel IDs disclosed through the use of the Tracking Tools identify: (i) the source and destination of incoming signals to Plaintiffs' devices to the Tracking Entities; and (ii) the source and destination of outgoing signals from Plaintiffs' devices.

235. Defendant did not obtain Plaintiffs' express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of fingerprinting and de-anonymization.

236. CIPA imposes civil liability and statutory penalties for the installation of trap and trace software without a court order. California Penal Code § 637.2. No court order to install a trap and trace device via the Tracking Tools was obtained by Defendant.

237. Defendant did not obtain Plaintiffs' or the Class Members' express or implied consent to be subjected to data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

**E.    Defendant Lacked Consent and Misrepresented the Effectiveness of Cookie Controls**

238. Plaintiffs' investigation revealed that the Website's default settings permitted tracking to begin as soon as users interacted with the Website, before users clicked "Accept" on the cookie banner.

239. As a result, users were tracked as soon as they began to use the Website, without prior consent.

240. Plaintiffs visited the Website while those default tracking settings were active.

241.    Users who visit the Website are shown a cookie banner offering the option to accept only "necessary" cookies.



*Figure 30 – The Cookie Banner shown to users who visit the Website*

242.    Despite those representations, even users who declined all unnecessary cookies continued to be tracked by at least New Relic and the BV Pixel.



*Figure 31- The New Relic Browser Monitoring tracking a user who declined all unnecessary cookies*

*Figure 32- The BV Pixel tracking a user who declined all unnecessary cookies*

CLASS ACTION COMPLAINT

243. Defendant allowed New Relic to place performance and analytics trackers and cookies via New Relic's browser monitoring on the Website, despite stating in the Cookie Settings that it would not do so unless users accepted the use of cookies.

244. Defendant intentionally placed BV Pixel tracking cookies on the Website and allowed Bazaarvoice to track users and intercept their communications with the Website, despite stating in the Cookie Settings that tracking cookies would not be placed and that users' information would not be shared with third parties unless users accepted the use of cookies.

245. Representations regarding cookie-consent controls are materially misleading where tracking continues despite a website's claim to the contrary and/or users' opt-out selections.

246. Defendant and the Tracking Entities benefited from the interception of Plaintiffs' communications by reading and subsequently using the intercepted contents to construct detailed profiles reflecting Plaintiffs' browsing habits and interests, and by using those profiles for targeted advertising.[132]

247. The Tracking Entities independently benefit from the interception of communications, using data collected through the Tracking Tools to improve their advertising products and market those capabilities to other businesses.[133]

---

[132] *See About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Feb. 17, 2026). ; *Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Feb. 17, 2026); *Enable automatic enhanced match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Feb. 17, 2026).

[133] *See TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms(last visited Feb. 17, 2026).; *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Feb. 17, 2026).

**CLASS ALLEGATIONS**

248.    Plaintiffs bring these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of two nationwide classes: the Heightened Notice Class and the General Notice Class (collectively "the Nationwide Classes").

249.    Plaintiffs Calles, James, and Wheeler bring this class action individually and on behalf of the following Heightened Notice Class:

> All natural persons in the United States who interacted with Cookie Banner One and whose Sensitive Information was intercepted, shared, or disclosed by Defendant to the Tracking Entities without authorization or consent (the "Heightened Notice Class").

250.    Plaintiffs Houseman, Sorkin, and Ianozi bring this class action individually and on behalf of the following General Notice Class:

> All natural persons in the United States who interacted with Cookie Banner Two and whose Sensitive Information was intercepted, shared, or disclosed by Defendant to the Tracking Entities without authorization or consent (the "General Notice Class").

251.    Plaintiffs Calles and James bring this class action individually and on behalf of the following California Subclass:

> All members of the Nationwide Classes who interacted with Defendant's Website while located in the State of California and whose electronic communications were intercepted, shared, or disclosed through Defendant's Tracking Tools to the Tracking Entities without authorization or consent (the "California Subclass").

252.    Plaintiff Houseman brings this class action individually and on behalf of the following New York Subclass:

> All members of the Nationwide Classes that interacted with Defendant's Website while located in the State of New York and whose electronic communications were intercepted, shared, or disclosed through Defendant's Tracking Tools to the Tracking Entities without authorization or consent (the "New York Subclass").

253.    Specifically excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees,

servants, partners, joint venturers, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

254. Plaintiffs reserve the right to amend the Classes definitions above if further investigation and/or discovery reveal that the Classes should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

255. NUMEROSITY: At this time, Plaintiffs do not know the number of the Classes' Members but believe the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Classes is believed to be so numerous that joinder of all members is impractical. The exact identities of the Classes' Members may be ascertained via the records maintained by Defendant.

256. COMMONALITY: Common questions of fact and law exist as to all of the Classes' Members and predominate over any questions affecting only individual members of the Classes. Such common legal and factual questions, which do not vary between the Classes' Members, and which may be determined without reference to the individual circumstances of any Member of the respective Classes, include but are not limited to the following:

a. Whether Defendant exposed the Classes' Members' personal information to the Tracking Entities or other third parties by making use of the Tracking Tools;

b. Whether Defendant obtained effective and informed consent to do so;

c. Whether the Classes' Members are entitled to statutory penalties; and

d. Whether the Classes' Members are entitled to injunctive relief.

257. TYPICALITY: As persons who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiffs are asserting claims that are typical of the Classes.

CLASS ACTION COMPLAINT

258.    ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

259.    SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all of the Classes' Members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE WIRETAP ACT
### 18 U.S.C. § 2510, et seq.
### (On Behalf of Plaintiffs and the Nationwide Classes)

260.    Plaintiffs incorporate the allegations in paragraphs 1-259 by reference as if fully set forth herein.

261.    The federal Wiretap Act, codified at 18 U.S.C. § 2510, *et seq.* (the "Wiretap Act"), prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

262.    The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

263.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

71
CLASS ACTION COMPLAINT

264. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

265. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

266. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

267. Defendant is a "person" within the meaning of the Wiretap Act.

268. The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

269. Plaintiffs had a reasonable expectation of privacy in their electronic communications with Defendant's Website, including their searches, browsing activity, and shopping-related interactions, particularly where Defendant represented through their cookie banner, cookie-preference interface, and Privacy Policy that users could opt out of the sale/sharing of personal information and decline non-essential Tracking Tools.

270. The reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on commercial websites, such as searches, browsing, and order interactions, are sensitive and convey the substance and meaning of the communication.

271. A reasonable user is entitled to assume that any disclosure of the contents of his communications occurs lawfully and with consent. To hold otherwise would require users to assume their privacy will be violated as a matter of course.

272. Plaintiffs reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of their electronic communications with Defendant's Website without their consent.

273.    Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were sent by the Tracking Tools and transmitted to Tracking Entities without Plaintiffs' consent, for the unlawful purpose of monetizing the Plaintiffs' intercepted Sensitive Information, including for combining that information with information collected about Plaintiffs from across the internet and used for advertising, analytics, and marketing optimization.

274.    Interception occurred whenever Plaintiffs interacted with the Website, including when they navigated webpages, used search or location features, viewed electronics, placed an order, or otherwise communicated information to the Website through their browsers.

275.    At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to Tracking Entities.

276.    Plaintiffs were not asked for consent before the Tracking Entities intercepted, recorded, disclosed, or used their electronic communications with the Website. To the contrary, Plaintiffs either affirmatively declined non-essential tracking through Defendant's cookie-preference interface when notified or were told by Defendant that their lack of consent would prevent the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities.

277.    The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

278.    Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website and allowed Tracking Entities to intercept the communications of users on the Website, for Defendant and Tracking Entities to subsequently use those intercepted communications after being processed by the Tracking Entities. Tracking Entities' interceptions were conducted despite Defendant's representations in Cookie Banner One and Cookie Banner

Two, in contravention of the Tracking Entities' terms. The interception and use of users' Sensitive Information without their consent invaded their privacy and violated state and federal laws protecting their privacy and preventing unfair and fraudulent business practices.

279.    As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs and the members of the Nationwide Classes have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

        a.    damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or

        b.    statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

        c.    reasonable attorneys' fees and costs.

**COUNT II**
**COMMON LAW INVASION OF PRIVACY**
**Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Nationwide Classes)**

280.    Plaintiffs incorporate the allegations in paragraphs 1-259 by reference as if fully set forth herein.

281.    Plaintiffs bring this cause of action on behalf of themselves and all members of the Nationwide Classes.

282.    Defendant has intruded upon the legally protected privacy interests of Plaintiffs and the members of the Nationwide Classes by, among other things, permitting third-party tracking technologies to collect, track, and compile users' Sensitive Information while representing to users that they could opt out of such collection.

283.    Plaintiffs and the members of the Nationwide Classes maintained a reasonable expectation that their communications with Defendant via the Website would remain private,

specifically with respect to their personal information, including browsing activity, device identifiers, and related metadata, which has been recognized as sensitive information.[134]

284. Plaintiffs and the members of the Nationwide Classes relied on Defendant's representations and did not accept the use of Tracking Tools, reasonably expecting that Defendant would honor its affirmative representation in the cookie banner that users could avoid tracking by not opting into the sale/sharing of personal information.

285. Despite the fact that Plaintiffs and the members of the Nationwide Classes did not authorize such tracking, Defendant permitted Tracking Entities to use cookies and related Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The Tracking Entities used and profited from these data to create detailed user profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

286. Defendant lacked any legitimate business justification for permitting the placement and transmission of the third-party cookies and Tracking Tools that allowed Tracking Entities to access, intercept, and collect users' Sensitive Information, contrary to users' express opt-outs.

287. As a direct and proximate result of Defendant's conduct, Plaintiffs and the members of the Nationwide Classes suffered injury, including but not limited to loss of privacy, loss of control over their personal information, diminution in value of their private data, and other compensable harms.

288. Plaintiffs and the members of the Nationwide Classes seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, statutory and punitive damages where available, and injunctive relief to prevent further unlawful tracing.

---

[134] For example, California voted to pass the California Consumer Privacy Act of 2018 ("CCPA") and voted to amend the CCPA in 2020 through Proposition 24, the California Privacy Rights Act (CPRA). The CPRA sets out that colling and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally,* Cal. Civ. Code §§1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

## COUNT III
### INVASION OF PRIVACY AND VIOLATION
### OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1
### (On Behalf of Plaintiffs Calles and James, and the California Subclass)

289.   Plaintiffs Calles and James incorporate the allegations in paragraphs 1-259 by reference as if fully set forth herein.

290.   Plaintiffs Calles and James bring this cause of action on behalf of themselves and all California Subclass Members.

291.   Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

292.   California voters added the word "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative."

293.   In support of Proposition 11, voters stated that:

"The right of privacy is the right to be left alone … It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom."

294.   Plaintiffs Calles and James, and the California Subclass Members, have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities with access to that data, thereby enabling the interception of such communications. Plaintiffs' and California Subclass Members' protected interests come from various statutes and common law, including, *inter alia*, the Wiretap Act, the CIPA, and the California Constitution, which protects the rights of privacy, and includes the "ability to control circulation of our personal information."

295.    The privacy rights of Plaintiffs Calles and James and the California Subclass Members were invaded through the interception and collection of their data, which included their Sensitive Information and other sensitive information, without first obtaining authorization or consent from Plaintiffs and the California Subclass Members.

296.    Plaintiffs Calles and James and the California Subclass Members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing their Sensitive Information.

297.    By causing third-party cookies and Tracking Entities to be placed on users' browsers and devices and by transmitting users' Sensitive Information to third parties despite users' choice not to opt in, Defendant violated their reasonable expectation of privacy.

298.    Defendant's intrusion, placing third-party Tracking Tools and enabling third-party access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

299.    As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiffs Calles and James and the California Subclass Members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

**COUNT IV**
**VIOLATION OF THE CALIFORNIA**
**INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiffs Calles and James and the California Subclass)**

300.    Plaintiffs Calles and James incorporate the allegations in paragraphs 1-259 by reference as if fully set forth herein.

301.    Plaintiffs Calles and James bring this cause of action on behalf of themselves and all California Subclass Members.

302.    CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of certain technologies determined to pose 'a serious threat to the free exercise

of personal liberties.'" CIPA extends civil liability for various means of surveillance using technology.

303.   CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

304.   The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020).

305.   In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see also Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

306.   The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

307.    Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs and the California Subclass Members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate CIPA § 631.

308.    Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

309.    Plaintiffs Calles and James and the California Subclass Members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. The violation of section 631 constitutes an invasion of privacy.

**COUNT V**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 638.51**
**(On Behalf of Plaintiffs Calles and James and the California Subclass)**

310.    Plaintiffs Calles and James incorporate the allegations in paragraphs 1-259 by reference as if fully set forth herein.

311.    Plaintiffs Calles and James bring this cause of action on behalf of themselves and all California Subclass Members.

312.    California's Pen Register and Trap and Trace Law is part of the California Invasion of Privacy Act ("CIPA") codified at Cal. Penal Code 630, et seq.

313.    A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

79
CLASS ACTION COMPLAINT

314.    A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

315.    "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

316.    California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…" Cal. Penal Code § 638.51(a).

317.    No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendant. Defendant uses pen register and trap and trace processes on its Website by deploying Tracking Tools, which are designed to capture phone numbers, email addresses, routing information, addresses, and other signaling information of website users. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

318.    Defendant was not authorized by any court order to use pen register or trap and trace devices to track Plaintiffs' and the California Subclass Members' activity on the Website.

319.    Defendant did not obtain consent from Plaintiffs and the California Subclass Members before using pen register or trap and trace technology to identify users of its Website, and has violated § 638.51.

320.    As a direct and proximate result of Defendant's conduct, Plaintiffs Calles and James and the California Subclass Members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of § 638.51.

**COUNT VI**
**VIOLATIONS OF NEW YORK'S DECEPTIVE ACTS AND PRACTICES**
**ACT N.Y. Gen. Bus. Law § 349**
**(On Behalf of Plaintiff Houseman and the New York Subclass)**

321.    Plaintiff Houseman incorporates the allegations in paragraphs 1-259 by reference as if fully set forth herein.

322.    N.Y. Gen. Bus. ("GBL") § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state..."

323.    Defendant conducts consumer-oriented business and trade in New York, including the operation of its Website, in its advertising and sale of goods throughout the country, as required by GBL § 349.

324.    Defendant violated GBL § 349 by deceptively representing, through its cookie banner and Cookie Preferences Interface, that users could control the collection, sale, or sharing of their Sensitive Information, while permitting Tracking Entities to collect and disclose users' data regardless of users' cookie choices.

325.    Defendant's misrepresentations and partial misrepresentations, including the omissions, active concealment, and other deceptive conduct described herein, falsely represented that users were provided a particular level of privacy protection and control over their Sensitive Information, when in fact Defendant continued to collect, disclose, and transmit users' Sensitive Information to Tracking Entities through the Tracking Tools regardless of users' cookie selections.

326.    Defendant's misrepresentations, omissions, active concealment, and other deceptive conduct described herein were directed at consumers, including Plaintiff Houseman, visiting Defendant's Website, occurred repeatedly in the course of Defendant's online business practices, and were capable of deceiving a substantial portion of the consuming public with respect to the collection and disclosure of their Sensitive Information.

327.    The facts Defendant misrepresented, concealed, or omitted were material in that Plaintiff and the New York Subclass Members, and other reasonable consumers, would have

considered them in deciding whether and how to interact with Defendant's Website. Had Plaintiff Houseman and members of the New York Subclass known that Defendant continued to collect and disclose their Sensitive Information through tracking technologies regardless of users' cookie preferences, they would not have visited the Website, would have limited their interactions with it, or would have taken steps to avoid or block such data collection.

328. Defendant alone possessed the information that was material to Plaintiff Houseman and the New York Subclass Members and failed to disclose said material information to consumers.

329. Therefore, Defendant has engaged in, and continues to engage in, deceptive conduct in violation of GBL section 349.

330. Defendant's unlawful conduct described herein caused Plaintiff Houseman and the New York Subclass Members to suffer injury in the form of actual damages, including the loss of control and value of their Sensitive Information and the unauthorized disclosure of Sensitive Information to Tracking Entities, which they would have avoided had Defendant accurately disclosed its data-collection and tracking practices.

331. Defendant intended for Plaintiff Houseman and the New York Subclass Members to rely on its misrepresentations and partial misrepresentations, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, regarding the nature and extent of its data-collection and tracking practices when deciding whether and how to interact with Defendant's Website, while unaware of the undisclosed material facts.

332. GBL § 349 applies to Plaintiff Houseman and the New York Subclass Members because the State of New York has an interest in regulating business conduct in the region. Defendant's operations emanate from its Palo Alto office, which is listed as a contact point for various consumer-facing programs.

333. Defendant's conduct has caused and is causing immediate and irreparable injury to Plaintiff Houseman and the New York Subclass Members. Defendant's conduct will continue

to damage both the Plaintiff and Class Members and deceive the public unless enjoined by this Court.

334.    As a direct and proximate result of Defendant's violations, Plaintiff Houseman, the New York Subclass Members, and other reasonable consumers have been harmed, and that harm will continue unless Defendant is enjoined from continuing to misrepresent and omit the true nature of its data-collection, tracking, and information-sharing practices.

**COUNT VII**
**VIOLATIONS OF NEW YORK'S FALSE ADVERTISING LAW**
**N.Y. Gen. Bus. Law § 350**
**(On Behalf of Plaintiff Houseman and the New York Subclass)**

335.    Plaintiff Houseman incorporates the allegations in paragraphs 1-259 by reference as if fully set forth herein.

336.    N.Y. Gen. Bus. ("GBL") § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

337.    Pursuant to GBL § 350-a, false advertising is defined as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect . . . [where "misleading" refers to] representations made by statement, word, design, . . . or any combination thereof, but also to the extent to which to which the advertising fails to reveal facts material in the light of such representations . . . ."

338.    Defendant knew or should have known that its representations regarding users' ability to control the collection, sale, or sharing of their Sensitive Information were false or misleading because the Tracking Tools continued to collect and disclose users' data through the Website regardless of users' cookie preferences.

339.    Defendant purposely misrepresented, actively concealed, and failed to disclose material facts regarding its data-collection, tracking, and information-sharing practices to consumers, including Plaintiff Houseman and the New York Subclass Members.

340. The facts misrepresented, concealed, or otherwise undisclosed by Defendant were material in that Plaintiff Houseman, the New York Subclass Members, and other reasonable consumers would have considered them when deciding whether and how to interact with Defendant's Website. Had Plaintiff Houseman and the New York Subclass Members known that Defendant continued to collect and disclose their Sensitive Information through Tracking Tools regardless of users' cookie preferences, they would not have visited the Website, would have limited their interactions with it, or would have taken steps to avoid such data collection.

341. Defendant obtained a benefit from Plaintiff Houseman and the New York Subclass Members by collecting, using, and disclosing their Sensitive Information through Tracking Entities, while depriving them of the ability to control the use and sharing of that Sensitive Information, despite the availability of reasonable alternatives that do not engage in the same deceptive data-collection practices.

342. Defendant's conduct caused Plaintiff Houseman and the New York Subclass Members to suffer actual damages by depriving them of the ability to make informed choices about the collection and disclosure of their personal information and by subjecting them to unauthorized tracking and data sharing, which they would have avoided had Defendant accurately disclosed its data-collection practices.

343. As a direct and proximate result of Defendant's violation of New York General Business Law § 350, Plaintiff Houseman and the New York Subclass Members have been injured, and that harm will continue unless Defendant is enjoined from continuing to misrepresent and omit the true nature of its data-collection, tracking, and Sensitive Information-sharing practices on the Website.

344. Defendant's conduct has also substantially injured the public, as consumers across the country were exposed to and relied upon Defendant's representations regarding its data-privacy practices while unaware of material omissions—specifically, the failure to disclose that users' personal information was collected, shared, and disclosed to third parties through tracking technologies regardless of users' cookie preferences.

345.    Defendant's omissions deprived consumers of the ability to make informed decisions about their online privacy and created a false impression that users' choices meaningfully controlled data collection and sharing, thereby undermining public trust in websites that purport to offer transparency.

346.    Defendant's conduct thus caused real-world harm and poses an ongoing risk of further injury if not enjoined.

347.    Pursuant to GBL section 350-e, Plaintiff Houseman and the New York Subclass Members seek injunctive relief, declaratory relief, actual and punitive damages, or $500 (whichever is greater), statutory damages of three times the actual damages (up to $10,000), and attorneys' fees.

## COUNT VIII
### INVASION OF PRIVACY AND
### VIOLATIONS OF N.Y. CIV. RIGHTS LAWS §§ 50, 51
**(On Behalf of Plaintiff Houseman and the New York Subclass)**

348.    Plaintiff Houseman incorporates the allegations in paragraphs 1-259 by reference as if fully set forth herein.

349.    Plaintiff Houseman brings this cause of action on behalf of herself and all New York Subclass Members.

350.    Plaintiff Houseman and the New York Subclass Members have a statutory privacy interest in their names, portraits, pictures, and voices under New York law.

351.    Defendant knowingly used Plaintiff Houseman's and the New York Subclass Members' names and other Sensitive Information in the State of New York for advertising and trade purposes without first obtaining their written consent. Specifically, Defendant transmitted Plaintiff Houseman's and the New York Subclass Members' Sensitive information and identities, such as the FID, to Tracking Entities like Facebook for targeted online advertising and other commercial purposes, as described herein. Defendant's use of Plaintiffs' and the Subclass Members' names and Private Information did not serve any public interest.

352. The unlawful tracking of Plaintiff Houseman and the New York Subclass Members and the disclosure of their names caused damages. This includes damage to the value of their information, which Defendant appropriated for its own enrichment. Plaintiff Houseman and the New York Subclass Members have also suffered nominal damages.

353. Defendant failed to protect Plaintiff Houseman's and the New York Subclass Members' Sensitive Information and acted knowingly when it installed the Tracking Tools onto the Website because the purpose of the Tracking Tools is to track and disseminate users' communications with the Website for the purpose of marketing and advertising.

354. Because Defendant intentionally and willfully incorporated the Tracking Entities into its Website and fraudulently told users that they could disable the Tracking Tools, Defendant had notice, and knew that its practices would cause injury to Plaintiff Houseman and the New York Subclass Members.

355. Plaintiff Houseman, on behalf of herself and the New York Subclass Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs. Alternatively, Plaintiff Houseman and the New York Subclass Members are entitled to nominal damages.

356. Plaintiff Houseman and the New York Subclass Members are entitled to exemplary and/or punitive damages as a result of Defendant's knowing violations of their statutory rights to privacy.

357. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff Houseman and the New York Subclass since their Sensitive Information is still in the possession of Defendant and the Tracking Entities, and the wrongful disclosure of the information cannot be undone.

358. Plaintiff Houseman and the New York Subclass Members have no adequate remedy at law for the injuries relating to Defendant's and the Tracking Entities' continued possession of their Sensitive Information.

359.    A judgment for monetary damages will not undo Defendant's disclosure of the information to the Tracking Entities, who, on information and belief, continue to possess and utilize that information.

360.    Plaintiff Houseman, on behalf of herself and the New York Subclass Members, further seeks injunctive relief to enjoin Defendant from further intruding into Plaintiff Houseman's and the New York Subclass Members' statutory privacy interests.

## COUNT IX
### COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
### (On Behalf of Plaintiffs and the Nationwide Classes)

361.    Plaintiffs incorporate the allegations in paragraphs 1-259 by reference as if fully set forth herein.

362.    Plaintiffs bring this cause of action on behalf of themselves and all Members of the Nationwide Classes.

363.    Defendant made affirmative representations to users through its cookie banner, cookie preferences interface, and related disclosures that users could opt out of the sale or sharing of personal information and could decline all non-essential cookies.

364.    Defendant represented that exercising those options would limit or prevent the deployment of non-essential Tracking Tools, including targeting and performance cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

365.    Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

366.    These representations were false and misleading. Before users, including Plaintiffs and the putative class members, were able to exercise the purported opt-in choice provided by Defendant, or otherwise did not accept the use of non-essential cookies, Defendant deployed the Tracking Tools to intercept and collect Plaintiffs' and the Classes' Members' Sensitive Information and transmit the same to the Tracking Entities, despite Defendant's

representation in the Cookie Settings that it would not track users until they consented to the Tracking Tools.

367. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices.

368. Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential tracking technologies based on user preferences, and Defendant could have implemented such measures.

369. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

370. Plaintiffs and the Nationwide Class Members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the opt-out controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

371. Plaintiffs' reliance was reasonable because Defendant presented the cookie banner and cookie preferences interface as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

372. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Nationwide Class Members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data.

373. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon opt-out.

CLASS ACTION COMPLAINT

374.    Plaintiffs and the Nationwide Class Members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

## COUNT X
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Nationwide Classes)

375.    Plaintiffs incorporate the allegations in paragraphs 1-259 by reference as if fully set forth herein.

376.    Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

377.    Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Nationwide Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

378.    It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent.

379.    Plaintiffs and the Nationwide Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Nationwide Class Members. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and the Nationwide Class Members are entitled to the relief set forth below.

## COUNT XI
## DECLARATORY JUDGMENT
### (On Behalf of Plaintiffs and the Nationwide Classes)

380.    Plaintiffs incorporate the allegations in paragraphs 1-259 by reference as if fully set forth herein.

381.    Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

382.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

383.    An actual controversy has arisen about Defendant's use of Tracking Tools, Defendant's disregard for the rights of Plaintiffs and the Class, and Defendant's present and prospective common law and statutory duties to keep Plaintiffs' Sensitive Information confidential unless and until disclosure is authorized. As long as Defendant's unlawful actions persist, Plaintiffs remain at continued and imminent risk that their Sensitive Information will continue to be disclosed without their authorization.

384.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring the following:

a.    Defendant owes a legal duty to Plaintiffs and the members of the Nationwide Classes to refrain from disclosing, or from facilitating the disclosure of, consumers' Sensitive Information without authorization.

b.    Defendant's many breaches of these legal duties caused—and continue to cause— injury to Plaintiffs and the members of the Nationwide Classes.

385.    The Court should issue corresponding injunctive relief requiring Defendant to keep the Sensitive Information of Plaintiffs and the members of the Nationwide Classes confidential as consistent with applicable law.

386.    Without an injunction, the members of the Nationwide Classes will suffer irreparable injury and lack an adequate legal remedy at law if Defendant continues to unlawfully disclose consumers' information without authorization.

387.    If an injunction is not issued, the resulting hardship to Plaintiffs and the members of the Nationwide Classes far exceeds the minimal hardship that Defendant could experience

from keeping Plaintiffs' Sensitive Information confidential, and Defendant has a pre-existing legal obligation to do so. An injunction would benefit the public by preventing Defendant's further unlawful disclosures of consumers' Sensitive information—thus preventing further injuries to Plaintiffs, the members of the Nationwide Classes, and the public at large.

### PRAYER

WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a.    An order certifying the class and making all appropriate class management orders;

b.    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the respective Classes and Subclasses and their counsel as Class Counsel;

c.    For an order declaring the Defendant's conduct violates the statutes referenced herein;

d.    For an order finding in favor of Plaintiffs and the Classes and Subclasses on all counts asserted herein;

e.    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

f.    An award of statutory damages or penalties to the extent available;

g.    For damages in amounts to be determined by the Court and/or jury;

h.    For pre-judgment interest on all amounts awarded;

i.    For an order of restitution and all other forms of monetary relief;

j.    An award of all reasonable attorneys' fees and costs; and

k.    Such other and further relief as the Court deems necessary and appropriate.

Dated: March 12, 2026

By: */s/ Thomas E. Loeser*

Joseph W. Cotchett (SBN 36324)
Thomas E. Loeser (SBN 202724)
Gia Jung (SBN 340160)
**COTCHETT PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
T: (650) 687-6000
F: (650) 697-0577
jcotchett@cpmlegal.com
tloeser@cpmlegal.com
gjung@cpmlegal.com

Karin B. Swope*
Jacob M. Alhadeff*
**COTCHETT, PITRE & McCARTHY, LLP**
1809 7th Avenue, Suite 1610
Seattle, WA 98101
T: (206) 802-1272
F: (206)-299-4184
kswope@cpmlegal.com
jalhadeff@cpmlegal.com

Edward Korsinsky*
Mark Jensen*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
T: (212) 363-7500
F: (212) 363-7171
ek@zlk.com
mjensen@zlk.com

*Counsel for Plaintiffs*

**pro hac vice* forthcoming

CLASS ACTION COMPLAINT